LAUREL, INC. *v.* COMMISSIONER OF TRANSPORTATION OF THE STATE OF CONNECTICUT

LOISELLE, BOGDANSKI, PETERS, PARSKEY and WRIGHT, Js.

Argued November 7, 1979—decision released March 4, 1980

*Robert Y. Pelgrift,* assistant attorney general, with whom were *Victor Feingold,* assistant attorney general, and, on the brief, *Carl R. Ajello,* attorney general, for the appellant-appellee (defendant).

*Daniel Shepro,* with whom were *Allan J. Rosen* and *Philip Baroff,* for the appellee-appellant (plaintiff).

LOISELLE, J. This is the court's third opinion in a course of protracted litigation which began when the defendant commissioner took 0.38 of an acre of

land from the plaintiff on January 23, 1974. The plaintiff appealed from the commissioner's $41,200 assessment of damages, alleging a constitutional taking of the remainder of its property, about 9.3 acres, and sought damages for that as well. The Superior Court awarded damages for inverse condemnation under General Statutes § 48-17b and ordered the defendants to amend the certificate of taking and assessment of damages and to take all of the plaintiff's property. The defendants appealed and the plaintiff cross appealed to this court. Error was found. The Superior Court was ordered to render judgment for the defendants in the action brought by Laurel, and to reinstate the condemnation proceedings initiated by the commissioner. *Laurel, Inc.* v. *State,* 169 Conn. 195, 207, 362 A.2d 1383 (1975) (hereinafter *Laurel I*). Upon reinstatement of the condemnation proceedings and Laurel's appeal from the assessment of damages, the commissioner filed a plea in abatement alleging that the court lacked jurisdiction because Laurel's appeal had not been filed within six months of the assessment as required by General Statutes § 13a-76. The plea was overruled by the Superior Court and the commissioner appealed. In *Laurel, Inc.* v. *Commissioner of Transportation,* 173 Conn. 220, 223, 377 A.2d 296 (1977) (hereinafter *Laurel II*), this court found no error, holding that the equitable relief provided by *Laurel I* clearly entitled the plaintiff to a determination of its damages in the reinstated condemnation proceedings. The Superior Court awarded damages of $2,576,300 to Laurel in the condemnation proceedings. From that judgment, both Laurel and the commissioner appeal.

## I

The finding of the court is substantially as follows: The plaintiff Laurel, Inc., a Connecticut corporation, was the record owner of 9.7 acres of land in the town of Fairfield. The land abutted the Merritt Parkway to the south near the parkway's intersection with route 59 known as Easton Turnpike or Sport Hill Road (hereinafter Easton Turnpike). On January 23, 1974, the commissioner condemned and took by eminent domain 0.38 acres of Laurel's land for public use as part of new on-off ramps for the Merritt Parkway. The certificate of taking[1] and the taking map which appears as an appendix to this opinion describe the portion acquired as a long narrow area leading from a physical outlet on

---

[1] "NOTICE OF TAKING:
SUPERIOR COURT
FAIRFIELD COUNTY
JANUARY 23, 1974

Laurel, Inc.
177 State Street, Bridgeport, Connecticut

The Connecticut Bank and Trust Company (Mortgagee)
1 Lafayette Circle, Bridgeport, Connecticut

Cyril Waynik (Mortgagee)
4697 Main Street, Bridgeport, Connecticut

The First Connecticut Small Business
Investment Company (Mortgagee)
177 State Street, Bridgeport, Connecticut

Allan J. Rosen (Duplicate Notice)
Attorney at Law
177 State Street, Bridgeport, Connecticut

Pursuant to the provisions of Section 13a-73(b) and (f), the General Statutes of Connecticut, as revised, the premises hereinafter described are found to be necessary for the layout, alteration, extension, widening, change of grade and improvement of the highway commonly known as Merritt Parkway, Fairfield-Trumbull Road and

Easton Turnpike to the remainder of Laurel's property where Laurel was in the process of building a condominium project to be known as "The Villager."

Prior to the time of the taking, Laurel had obtained a special permit from the town planning and zoning commission for the construction of 103 condominium residence units on this tract of land. Laurel's special permit constituted approval and authorization for all plans of construction, landscaping and all matters necessary for the completion of the project. The terms of the special permit provided, however, that access to and egress from the condominium project was limited solely to Easton Turnpike, to the west of the plaintiff's land. There are two other streets, Stevenson Road and Toll House Road, which abut the plaintiff's prop-

---

the same are hereby taken, and this assessment of damages resulting therefrom is hereby filed with the Clerk of the Superior Court in the County in which said premises are located.

Said premises are situated in the Town of Fairfield, County of Fairfield and State of Connecticut, on the northeasterly side of Present Easton Turnpike, (Sport Hill Road), Route 59, and bounded:

SOUTHWESTERLY — by Present Easton, (Sport Hill Road), Turnpike Route 59, 42 feet, more or less;

NORTHWESTERLY — by land now or formerly of Leon E. Deepstrom, 387 feet, more or less;

NORTHEASTERLY — by owner's remaining land, 46 feet, more or less, by a line designated as 'Taking Line', as shown on the map hereinafter referred to;

SOUTHEASTERLY — by owner's remaining land, 119 feet, more or less, by a line designated as 'Taking Line and Non-Access Highway Line', as shown on said map;

SOUTHWESTERLY — by land of the State of Connecticut, 17 feet, more or less;

SOUTHEASTERLY — by land of the State of Connecticut, 280 feet, more or less.

And said parcel contains 0.38 of an acre, more or less, together with all appurtenances, all of which more particularly appears on a map attached hereto, hereinbefore and hereinafter referred to entitled: 'Town of Fairfield, Map Showing Land Acquired from Laurel Inc. by The State of Connecticut, in Connection with Merritt Park-

erty to the east and provide direct physical access. The Fairfield zoning authorities stipulated in the special permit, however, that those roads were not to be used by Laurel; instead Laurel was to have sole use and control of the 0.38 acre strip, later taken by the commissioner, which abutted Easton Turnpike as a private means of ingress and egress. After the taking, the Fairfield town planner took no action with respect to revocation of the special permit so as to afford Laurel and the state officials an opportunity to resolve the problem of access to Easton Turnpike. The special permit was not revoked. It simply expired two years after it was issued. After the taking, the likelihood of Laurel obtaining a revised special permit to continue with the condominium development was nil.

way (Sec. 13A-73F), Scale 1″ = 40′, Dec. 1972, George S. Koch, Deputy Transportation Commissioner - Bureau of Highways.' (50-111-1)

The Commissioner of Transportation pursuant to statutory authority hereinbefore referred to, hereby takes and terminates the owner's rights of access directly to and from a portion of Condominium Road, from and to owner's remaining land, lying easterly thereof, specifically across the southeasterly highway line of Condominium Road, extending northeasterly from land of the State of Connecticut to approximately opposite Station 19+53 Right, (Base Line of Condominium Road), as shown on said map.

Further rights hereby taken on a portion of owner's remaining land are as follows:

1. A full and perpetual easement to slope for the support of the highway, covering an area of 0.02 of an acre, more or less, approximately opposite and between Stations 18+35 and 19+53 Right, (Base Line of Condomium Road), as shown on said map.

Said premises are taken subject to a 40′ x 385′ R.O.W. in favor of land now or formerly of Leon E. Deepstrom as appears of record in Volume 550 at Page 307 of the Fairfield Land Records.

Said premises stand on record in the name of Laurel, Inc.

Damages are assessed at $41,200.00.

JOSEPH B. BURNS
Commissioner of Transportation
State of Connecticut"

As of the date of the taking on January 23, 1974, Laurel had erected two buildings, a clubhouse which was about two-thirds completed and the first residential structure which was about one-half completed. Extensive underground improvements had been made. The installation of utilities and sewers had been completed. An outdoor swimming pool south of the clubhouse was partially constructed. Laurel had obtained permits to construct several buildings on the property. To obtain the special permit, Laurel had drawn and submitted plans for the entire project which were approved by the town. Laurel had entered into contracts to finance the project and to obtain the necessary labor and supplies. Sales brochures had been printed and a list of prospective purchasers who had called about the project was maintained. On the date of the taking, the plaintiff had expended $1,654,900 for the purchase of its land and for all improvements thereon.

The 0.38 acre strip which the commissioner took in condemnation was required by Laurel as an access road to Easton Turnpike. The strip abuts Laurel's remaining property to the east, where the boundary crosses through the clubhouse building, and Easton Turnpike to the west. The commissioner's taking map, although it does not show the presence of Laurel's partially completed structures, extends the taking line on the east into the plaintiff's condominium area, cutting off four feet of the clubhouse building along its entire length.[2]

Within three days of receiving notice of the taking, Laurel stopped all work on the Villager

---

[2] Two other maps prepared by the commissioner showed a taking line which cleared the clubhouse entirely. Those maps were also introduced into evidence or referred to by the testimony.

condominium site upon the advice of counsel, town officials and other advisors. Laurel brought suit against the state and the transportation commissioner within six days after receiving notice and sought damages for a constitutional taking of the remaining 9.3 acres of its land. The case was tried to the Superior Court where Laurel prevailed, but upon the state's appeal to this court, judgment was ordered for the defendants on the ground that Laurel had not established a constitutional taking of its remaining land. These findings arose from the condemnation proceedings instituted by the commissioner which this court ordered reinstated.

The court computed Laurel's damages for condemnation of the 0.38 acre strip as follows. At the time of the taking on January 23, 1974, there was a market for the sale of Laurel's partially completed condominium project. The project, on the basis of its location, type of units, amenities, and overall concept, was marketable. Although a determination of the fair market value of Laurel's property before the taking was difficult because successful or about to be successful condominiums are neither sold nor for sale, a reasonable buyer on a total purchase-money mortgage, no-risk basis, would enter into a contract to complete the project for one-half the final net profit realized from the sale of the condominium units. The total net profit reasonably anticipated if the project were to be completed after the taking was approximately 2.1 million dollars. The value of Laurel's property before the taking was $2,706,800: $1,654,900 in acquisition and land enhancement costs plus $1,051,900, Laurel's one-half share of the profits. The value of Laurel's remaining 9.32 acres after the taking was $130,500, based on $14,000 per acre for single family resi-

dence use in accordance with zoning requirements. Laurel was awarded the difference between the before and after values of its property, $2,576,300, less the state's original deposit of $41,200 or $2,535,100, together with interest and costs.

The court found that the fair market value of the property was not merely the cost of the land plus the cost of development because Laurel had assembled, at the time of the taking, a "package" of great fair market value. The permits previously acquired by Laurel had eliminated the risk of administrative delay or even denial. A buyer would know that he was buying more than land and partially completed buildings. A buyer would know that he was buying an approved plan of development that would produce revenue. A buyer and seller, in arriving at a fair market value of the incomplete project, would prepare a pro-forma profit and loss statement for the project which would project total cost and total sales revenue and estimate potential profit. They would then negotiate a fair allocation of the projected profit. The division of profit between buyer and seller would depend on how much work the seller, in this case Laurel, had done, and the extent to which financing would be made available to the buyer. The purchase price would be determined by what the buyer would realize from a subsequent sale of the project. Although a buyer would not be willing to pay Laurel the full profit which Laurel could have realized on a completed project, Laurel would be entitled to some profit by virtue of its assemblage of an approved project.

The court determined the fair market value of Laurel's project at the time of the taking in accord-

ance with the method used by both the plaintiff's and the defendant's appraisers. The court determined Laurel's share of the anticipated profit as follows. First, it determined the fair market value of the project when completed. From this it subtracted the cost of the project to the date of the taking and the costs necessary for the project's completion to arrive at the anticipated profit. Laurel's share of the anticipated profit was assumed proportional to the percentage of the total cost which Laurel had incurred.

The court made these remaining findings of fact. The taking of the strip of land and the commissioner's plan to construct on it materially altered the essential condition of the special permit for construction, because they deprived Laurel of all legal access to Easton Turnpike. No specific right-of-way or easement over the condemned property was given to Laurel in the taking certificate or in the taking map recorded by the commissioner, regardless of the possibility that one may have been intended. The commissioner's taking map bears no legend indicating limited access or non-access on either the east or west lines of the taken portion, that is, where the strip taken abuts the remainder of Laurel's land on the east and Easton Turnpike on the west. The taking destroyed Laurel's only source of direct access to and from Easton Turnpike. The lack of access to Easton Turnpike compelled Laurel to abandon its plan to develop the condominium units. The project had progressed to the point where its successful and profitable completion was practically assured, until the commissioner took the 0.38 acre strip. Furthermore, on the date of the taking and in the reasonably foreseeable future, there was no need for the

land taken as a highway. The taking was an advance acquisition under General Statutes § 13a-79a.[3]

Finally, the finding states that after the hearing in damages had been completed and the memorandum reassessing damages had been filed, the hearing was reopened on a motion by the commissioner to allow him to examine Laurel's books and records to ascertain the accuracy of the court's finding that Laurel had expended $1,654,900 in the development of the project as of the taking date. On the rehearing, the court heard testimony from a certified public accountant who examined, on behalf of the commissioner and under his supervision, all of Laurel's books and records, including cancelled checks. The accountant testified that the $1,654,900 figure was in fact accurate and did not include any improper charges. The hearing was concluded without further testimony.

---

[3] At the time of the taking, General Statutes § 13a-79a provided in part: "RIGHT-OF-WAY REVOLVING FUND. PAYMENT OF TAXES ON AND LEASE OF PROPERTY ACQUIRED PRIOR TO HIGHWAY CONSTRUCTION. There is created a fund to be known as the 'highway right-of-way revolving fund' or 'revolving fund.' There is appropriated to the revolving fund two million dollars out of any moneys to the credit of the highway fund. The revolving fund shall be expended by the commissioner of transportation to pay all costs and expenses incident to the acquisition of property for right-of-way of state highways proposed to be thereafter constructed or reconstructed by the commissioner, or otherwise pursuant to law, only when no funds are available from other sources for the acquisition of such property . . . . All funds obtained from such use of the property shall be deposited in the revolving fund. *When actual highway construction or reconstruction commences on rights-of-way so acquired from moneys in the revolving fund,* the commissioner of transportation shall reimburse the revolving fund from regular highway construction appropriations for all previous advances. The commissioner of transportation shall submit a report to each regular session of the general assembly of all transactions of said fund, including properties acquired, properties disposed of and the balance in said fund." (Emphasis added.)

## II

The commissioner's appeal raises two issues. The first is whether Laurel retained a right of access to Easton Turnpike from its remaining 9.32 acres after the taking. The second concerns the commissioner's claim that the trial court erred when it included $1,051,900 lost profits in the damages awarded to Laurel. All errors assigned by the commissioner, in both his original assignments of error and his amendments thereto, relate to one or both of these issues.

### A

The commissioner advances two claims in support of his contention that Laurel retained a right of access to Easton Turnpike after the taking. First he contends that the trial court erred in concluding that the parties were bound by the decision of this court in *Laurel I* which Laurel contends upheld the first trial court's finding that the commissioner had taken its only access to Easton Turnpike. The commissioner claims that the parties were not precluded from litigating this issue in the subsequent condemnation proceedings and that the court erred in deriving its conclusion that the commissioner had taken Laurel's only access to Easton Turnpike from the previous litigation.

"Collateral estoppel 'is that aspect of res judicata which is concerned with the effect of a final judgment on the subsequent litigation of a different cause of action involving some of the issues determined in a former action between the parties.' " (Citation omitted.) *Connecticut Light & Power Co.* v. *Tax Commissioner,* 169 Conn. 58, 62, 362 A.2d 958 (1975); *Corey* v. *Avco-Lycoming Division,* 163

Conn. 309, 317, 307 A.2d 155 (1972), cert. denied, 409 U.S. 1116, 93 S. Ct. 903, 34 L. Ed. 2d 699 (1973). In addition, application of the doctrines of res judicata and collateral estoppel depend on the existence of a valid final judgment by a court of competent jurisdiction. *Corey* v. *Avco-Lycoming Division,* supra. See James & Hazard, Civil Procedure (2d Ed.) § 11.16, p. 563. It is well established that the decision of this court "does not make res judicata any issue of fact involved in it; it is the judgment of the tribunal from which an appeal is taken which, if affirmed by us or rendered in conformity to a decision we make, conclusively determines any such issues." *Osterlund* v. *State,* 135 Conn. 498, 502, 66 A.2d 363 (1949); *Pepin* v. *Danbury,* 171 Conn. 74, 80, 368 A.2d 88 (1976).

Although the first and second judgments of the Superior Court were rendered upon different causes of action, the first judgment was neither valid nor final. The first judgment in Laurel's favor was set aside and the case was remanded with direction to enter judgment for the defendants by our decision in *Laurel I,* supra, 207. This court directed the reinstatement of the condemnation proceedings which led to the second judgment, and it is from that judgment that the commissioner appeals. Therefore, the first trial court's finding in the action instigated by Laurel for damages was not binding on the parties in the condemnation proceeding brought by the commissioner. That portion of the trial court's finding which concludes that the parties were bound by the findings incident to the first judgment with regard to access is in error.

The commissioner's second claim in support of his contention that Laurel retained a right of access

is that the trial court erred in concluding, independently of the findings incident to the first judgment, that Laurel had no such right. One of the findings of fact which is attacked by the commissioner is really a conclusion and is treated as such.

The commissioner sets forth several arguments in his brief to support his attack on the trial court's conclusion that the taking deprived Laurel of access. First, he argues that the evidence offered at trial showed that the taking did not destroy Laurel's right of access because Laurel became, on the date of the taking, a common-law abutter along the 46-foot northeasterly frontage of the state's newly acquired 0.38 acre strip. According to the commissioner, Laurel, as a common-law abutter, acquired common-law rights of ingress and egress to the state highway to be built on the taken strip commonly referred to as Condominium Road. The commissioner's second argument in support of the existence of a right of access for Laurel is that the land taken was intended for use as a service highway which, under General Statutes §§ 13a-26 (c) and (d),[4]

---

[4] At the time of the taking, General Statutes § 13a-26 provided in part: "(c) SERVICE HIGHWAYS. As an adjunct of any parkway or freeway, the commissioner is authorized to lay out and construct highways and drives, to be designated as service highways, to provide access from areas adjacent to a parkway or freeway and to provide for the restriction or elimination of cross traffic on such parkway or freeway, when he deems the same to be necessary in the public interest. (d) ACQUISITION OF LAND. The commissioner is authorized to purchase or take any real property or rights in real property necessary or required for the construction, alteration, extension, widening, change of grade or improvement of such parkways, freeways or service highways in the same manner as is provided in the general statutes in the case of state highways. The provisions of the general statutes relating to state highways not inconsistent with the provisions of this section shall apply to parkways, freeways and service highways."

would provide access to the parkway from areas adjacent to it, such as the remaining land owned by Laurel.

In his third argument in support of Laurel's right of access, the commissioner contends that since the taking certificate and taking map do not expressly indicate "non access" along the 46-foot frontage to Laurel's remaining land, it is clear that he did not exercise his authority to condemn rights of ingress and egress pursuant to General Statutes § 13a-73 (f).[5] The commissioner relies upon a comparison of the map's notations expressly condemning Laurel's right of access along the strip's 119-foot frontage to Laurel's remaining land on the south and the absence of such notations along the strip's 46-foot frontage to the east. These notations include the words "Taking Line and Non Access Highway Line" with an arrow pointing to the 119-foot frontage, and the words "Rights of Access Acquired" in a rectangular box with protruding arrows which encompass the 119-foot frontage. The commissioner's first assignment of error claims that the trial court erred by refusing to include in its findings yet another difference in the map's notation with regard to the 119-foot and the 46-foot boundaries of the taken

[5] General Statutes § 13a-73 (f), at the time of the taking, provided: "PURCHASE OR CONDEMNATION OF RIGHTS OF ACCESS AND EGRESS. The commissioner may take or purchase rights of access to and egress from land abutting any highway or land taken or purchased as right-of-way therefor, or any other highway for the purpose of protecting the functional characteristics of any state highway or state highway appurtenances or safety of the traveling public to and from any state highway or state highway appurtenances when in his judgment such limitation of access is necessary to permit the convenient, safe and expeditious flow of traffic. Such taking or purchase shall be in the same manner and with like powers as authorized and exercised by said commissioner in taking or purchasing real property for state highway purposes."

strip where they front Laurel's remaining land. In his draft finding, the commissioner claimed that the four dashes along the east and west lines of the strip, which measure approximately forty feet in length, indicate an acquisition line but not a non access line. The appendix to the commissioner's brief contains testimony of the defendant's expert witness Edwin Fijol, a design engineer for the bureau of highways employed by the Connecticut department of transportation. Fijol testified that the 46-foot easterly boundary of the taken strip had four dashes which, according to the state's conventions, delineates an acquisition line as opposed to a non access line, which is delineated by two dashes such as those which appear along the 119-foot southerly border of the taken strip. Since this assertion is supported by evidence printed in the commissioner's brief and is not disputed by Laurel, we make this limited addition to the facts found. *Cutler* v. *MacDonald,* 174 Conn. 606, 610, 392 A.2d 476 (1978). The remainder of that draft finding which the commissioner seeks to include in the finding is a statement that the map contains the legend "non access" along the north and south lines of the taken area but no such legend along the east and west. This assertion is disputed by Laurel and is in direct contradiction to the finding of the referee. No correction is made to the finding under these circumstances. In addition to these notations on the map, the commissioner also refers to that portion of the taking certificate which states: "The Commissioner of Transportation pursuant to statutory authority hereinbefore referred to [General Statutes §§ 13a-73 (b) and (f)], hereby takes and terminates the owner's rights of access directly to and from a portion of Condominium Road, from and

to owner's remaining land, lying easterly thereof, specifically across the southeasterly highway line of Condominium Road, extending northeasterly from land of the State of Connecticut to approximately opposite Station 19 + 53 Right, (Base Line of Condominium Road), as shown on said map."

It is the commissioner's contention that these documents, the certificate and the map, show that the only right of access condemned under § 13a-73 (f) was access along the 119-foot frontage, and that they served to put Laurel, as fee simple owner of the remaining land abutting the strip's 46-foot frontage, on notice that it would have a common-law right of access onto the new highway where it connected to what was left of the private road to the condominium development. The commissioner cites case law in support of this proposition, and claims that the taking certificate and accompanying map must be construed in the same manner as a deed. If these documents are clear and unambiguous in the preservation of a right of access for Laurel, or if they are ambiguous but the commissioner's intent was to preserve such a right of access, then, according to the commissioner, the trial court's conclusion that the taking destroyed Laurel's access to its remaining land was in error.

The commissioner's final argument in his attack on the trial court's conclusion that the taking destroyed Laurel's access is that the taking could not legally have deprived Laurel of all access to Easton Turnpike because it is a general rule in the law of eminent domain that only such an estate in the property sought to be acquired as is reasonably necessary for the accomplishment of the public purpose may be taken. The commissioner reasons that

since his condemnation of Laurel's rights of access along the 119-foot southeasterly frontage would satisfy the public needs, condemnation of Laurel's rights of access along the 46-foot frontage would be unjust, both to Laurel which is entitled to retain whatever the public needs do not require, and to the public which should not be obliged to pay for more than it needs.

The commissioner's first argument, that Laurel had a right of access by virtue of its status as an abutting landowner, is not supported by the law. The certificate of taking states that the land was taken for the Merritt Parkway which is a limited access highway. There are no abutter's rights to a limited access highway. *South Meadows Realty Corporation* v. *State,* 144 Conn. 289, 294, 130 A.2d 290 (1957). The Merritt Parkway, to which the new on-off ramps located on the taken strip would connect, is a state highway especially designed for and devoted exclusively to the use and accommodation of noncommercial motor vehicle traffic, "to which access may be allowed only at highway intersections designated by the commissioner and designed by him so as to eliminate cross traffic of vehicles." General Statutes §13a-26 (a). The purposes of this statute limiting access to a parkway are safety, the reduction of traffic accidents, and the increased efficiency of traffic flow. Therefore, although there may be an intent to serve abutting landowners when an ordinary or conventional road is built; *Norwalk* v. *Podmore,* 86 Conn. 658, 665, 86 A. 582 (1913); 2 Casner, American Law of Property § 9.54, pp. 493–94; there is no such intent when land is condemned for a limited access highway, unless rights of access are specifically granted. 3 Nichols, Eminent Domain (3d Ed.) § 10.2211 [2], p. 398.

Neither the certificate of taking nor the accompanying map specifically granted Laurel a right of access to the parkway.

The commissioner's second and third arguments, that the land taken was intended for use as a service highway and that the taking documents reserved a right of access to Laurel by their failure to indicate non access, can be considered together in the context of General Statutes § 13a-73 (b). It is this statute which empowers the state commissioner of transportation to take land which he finds necessary for the improvement of any state highway. The statute also sets forth the procedures with which the commissioner must comply to take the land and declares the legal effect of those procedures. Paramount among the considerations articulated by the statute and fundamental to both state and federal due process requirements are those portions which ensure that each person who has an interest of record in the land shall receive notice of the taking, and that the commissioner shall sign and file with the town clerk a certificate setting forth the fact of the taking, a description of the real property so taken and the names and residences of the owners from whom it was taken. Finally, the statute provides that: "Upon the filing of such certificate, title to such real property in fee simple shall vest in the state of Connecticut except that, if it is so specified in such certificate, a lesser estate, interest or right shall vest in the state." This statutory language is germane to the commissioner's second argument, that Laurel had a right of access to the taken strip since it was intended for use as a service highway which would provide access from areas adjacent to a parkway under General Statutes

§ 13a-26 (c), because, under § 13a-26 (d),[6] the commissioner's acquisition of land for a service highway must comport with the procedural requirements of § 13a-73 (b) outlined above.

The statute requires and due process demands that the commissioner's description be such as will definitely identify the property taken. 1 Nichols, Eminent Domain (3d Ed.) § 4.107, p. 4-124. The description must be precise and unambiguous to ensure that the rights of the parties are safeguarded. Although the certificate of taking and an accompanying map need not contain a minute description of the land taken, the commissioner's intent should not be left to construction. Id. Without a full and accurate description, the landowner cannot be certain what land has been taken or whether the commissioner's assessment of damages should be appealed. See *Munson* v. *MacDonald,* 113 Conn. 651, 655–56, 155 A. 910 (1931). In *Slavitt* v. *Ives,* 163 Conn. 198, 205–207, 303 A.2d 13 (1972), this court held that the defendant highway commissioner's failure to specify the exclusion of a right-of-way in favor of the condemnee on the description of the taken premises meant that, under General Statutes § 13a-73 (b), the condemnee's right-of-way had been taken.

The taking certificate and map, which the state concedes contained identical descriptions, did not specify in express terms that access or a right-of-way had been reserved by the commissioner in favor of Laurel. This omission is highlighted by the commissioner's reservation, both in the certificate and on the map, of a 40-foot by 385-foot right-

[6] See footnote 4 supra.

of-way in favor of Laurel's neighbor Leon E. Deep-strom. As a result, Laurel's posture as of the date of the taking was not unlike that of the condemnee in *Slavitt* v. *Ives,* supra. The taking certificate stated that Laurel's land was necessary for improvements to the Merritt Parkway, but since this was a limited access highway, the probability of access appeared remote. Although use of the parcel for a service road might have rendered access more probable, the commissioner's taking certificate made no mention of a service road as an intended use. As the commissioner himself acknowledges in his brief, statutes authorizing the exercise of eminent domain are to be strictly construed against the condemnor. 3 Nichols, Eminent Domain (3d Ed.) § 9.2 [1], pp. 9–15. Where the description of the land to be taken for the improvement of a limited access highway does not expressly reserve an essential right-of-way in the condemnee, the certificate will be construed to have condemned that right-of-way and title to it shall be deemed to have vested in the state pursuant to the provisions of General Statutes § 13a-73 (b).

The fourth and final argument of the commissioner is that he could not have condemned Laurel's right of access along the 46-foot frontage of the taken strip because the public needs did not require it. Laurel could not have ascertained what bundle of rights in the land was required to satisfy the public needs, nor did it have an obligation as condemnee to do so. Furthermore, by the time Laurel could obtain a judicial determination of the extent of the taking, indeed shortly after the taking, the likelihood of obtaining a revised special permit to continue with the project was nil.

The commissioner's remaining assignments of error with regard to the existence of a right of access for Laurel attack two of the trial court's findings of fact and one conclusion, and challenge the trial court's refusal to accept seven of the commissioner's claims of law. The commissioner challenges the court's finding of fact that on the date of the taking and in the reasonably foreseeable future there was no need for the land as a highway and that the taking was an advance acquisition under General Statutes § 13a-79a.[7] The commissioner claims that this finding is inaccurate, argumentative, repetitious and unsupported by the evidence. Yet the commissioner's expert, Fijol, testified to this both on direct and on cross-examination. No correction to the finding is warranted.

The other finding of fact and the conclusion attacked by the commissioner are related and can be treated together. The trial court found that because of the lack of access to Easton Turnpike, Laurel was compelled to abandon its plan of development for the condominium units and concluded that after the taking the likelihood of Laurel obtaining a revised special permit to allow it to continue with its condominium development was nil. In view of the shortcomings inherent in the commissioner's description of the property taken, both in the certificate and in the map, Laurel could reasonably have concluded that it lacked access to Easton Turnpike and, therefore, that it was compelled to abandon the project. There was testimony that landowners abutting the roads adjacent to the east of Laurel's property, Toll House and Stevenson Roads which Laurel was forbidden to use by the terms of the special permit, had

---

[7] See footnote 3 supra.

already protested Laurel's access to the project over these roads. The testimony also established that by 1974 the rise in interest rates and the emergence of statutes and regulations protecting the inland wetlands rendered it unlikely that Laurel would have obtained a revised special permit for condominium construction similar to the permit it had obtained in 1972. There was further evidence that based on reasonable probability, no other zoning except reversion to an R-3, that is a single family residential district, was possible in Laurel's location. Moreover, the commissioner's attack on the trial court's finding that Laurel was compelled to abandon the project despite its future prospects and the court's conclusion that the likelihood of obtaining a revised special permit was nil cannot prevail in view of the testimony of Earl Rush, planning director for the town of Fairfield. Rush testified that after the taking "[i]t became obvious with the planning and zoning commission and the town attorney's office and ours, that what the commission had approved was now in question and [Laurel] would not be able to go ahead until something was cleared up. . . . If there is no access to [Easton Turnpike] from this property, there is no reasonable probability that special permits for condominium or multi-family use on the day of the taking will be given. . . . There is no chance of getting multi-family use with access over the two adjoining streets." Rush also concluded that without access to Easton Turnpike the highest and best use for the property would be for single family homes. The evidence amply supports both the trial court's finding of fact and its conclusion.

Of the commissioner's seven claims of law which relate to the issue of access, the first four advance

legal arguments concerning the description of the land taken and the preservation of access by implication. Since these claims were reviewed in the discussion of the commissioner's attack on the trial court's conclusion that Laurel's right of access had been destroyed, they need not be discussed again.

The three remaining claims of law on the issue of access are similar in that each advances a speculative solution to the problem of non access. The first asserts that Laurel "was eligible to apply for driveway permits under [General Statutes §§] 13a-143a and 14-311 so that it could open out onto a state highway along the new highway line abutting [its] property." The second states that "[d]uring a period when the State was not yet constructing and paving its service road over the taken property to [Easton Turnpike]," Laurel could create its own road or driveway over the taken land. The third asserts that even after the taking, the remainder of Laurel's land was zoned for multi-family housing units eligible for another special permit.

There is no finding that driveway permits, if requested, would have been granted. Moreover, in view of the safety considerations expressed by the legislature in § 13a-143a and § 14-311,[8] it is not

---

[8] At the time of the taking, General Statutes § 13a-143a provided: "DRIVEWAY PERMITS. No person shall construct a new driveway or relocate an existing driveway leading onto a state highway without first obtaining a permit from the commissioner of transportation. In determining the advisability of issuing such permit, the commissioner shall include, in his consideration, the location of the driveway with respect to its effect on highway drainage, highway safety, the width and character of the highway affected, the density of traffic thereon and the character of such traffic. The person to whom the permit is issued shall comply with the provisions and restrictions contained therein at his own expense."

General Statutes § 14-311 provided in part: "OPEN AIR THEATERS, SHOPPING CENTERS ON STATE HIGHWAYS. No person shall build,

unlikely that such driveway permits would have been denied. With regard to the second of these three claims, the taking certificate specified that the land was taken for improvements to the Merritt Parkway, not for a service road. Furthermore, regardless of the purpose of the taking, even if we assume that Laurel could use taken land during the period when the state was not engaged in construction, the commissioner's claim fails to provide alternative means of access for Laurel during the period when the state is engaged in construction or thereafter. Finally, the commissioner's unsuccessful attack on the trial court's finding that the likelihood of Laurel obtaining a revised special permit for the project after the taking was nil renders the commissioner's assignment of error to the court's failure to accept his last claim of law on the issue of access theoretical and of no practical consequence.

The trial court's independent conclusion that the commissioner's taking deprived Laurel of access to Easton Turnpike is consistent with the facts, logical, reasonable and supported by the law. *Bell* v. *Planning & Zoning Commission,* 174 Conn. 493, 496, 391 A.2d 154 (1978); *Connecticut Coke Co.* v. *New Haven,* 169 Conn. 663, 675, 364 A.2d 178 (1975).

expand, establish or operate any open air theater, shopping center or other development generating large volumes of traffic, having an exit or entrance on, or abutting or adjoining, any state highway within this state unless the person building, establishing or operating such open air theater, shopping center or other development generating large volumes of traffic has procured from the state traffic commission a certificate that the operation thereof will not imperil the safety of the public. In determining the advisability of such certification, the state traffic commission shall include, in its consideration, highway safety, the width and character of the highways affected, the density of traffic thereon and the character of such traffic. . . . The commissioner of transportation may issue a permit to said person to construct or install the changes required by the state traffic commission. . . ."

Although the trial referee erred in finding that the parties were bound by this court's judgment in *Laurel I,* there is an adequate and independent basis for the finding that the taking destroyed Laurel's right of access. There is no error in the trial court's conclusion on the issue of access.

## B

The second issue raised by the commissioner's appeal concerns the trial court's inclusion of $1,051,900 in lost profits in its award to Laurel. The trial court's computation of damages is set forth in part I above and need not be repeated here.

The commissioner assigns as error the trial court's assessment of the before and after taking values of Laurel's property, the computation of the total net profit reasonably to be anticipated from the project and Laurel's share thereof, and the final computation of damages which incorporates all these figures. Ten of the remaining twelve findings which are attacked on the issue of profits explain the trial court's assumptions and its method of computing the damage award as it did. The last two findings attacked are two claims of law advanced by the commissioner at trial but rejected by the trial court.

The owner of land taken by condemnation is entitled to just compensation. Conn. Const., art. I § 11. "If the taking is partial, the usual measure of damages is the difference between the market value of the whole tract with its improvements before the taking and the market value of what remained of it thereafter. Severance damages to the parcel remaining are thereby included. *Meriden* v. *Ives,* 165 Conn. 768, 773, 345 A.2d 13; *Connecticut Print-*

*ers, Inc.* v. *Redevelopment Agency,* 159 Conn. 407, 414, 270 A.2d 549. The 'fair market value' is the price that the trier reasonably thinks would result from fair negotiations between a willing seller and a willing buyer. The valuation should ordinarily be based on the 'highest and best' possible use of the land. *Connecticut Printers, Inc.* v. *Redevelopment Agency,* supra, 411–13." *Lynch* v. *West Hartford,* 167 Conn. 67, 73, 355 A.2d 42 (1974). Application of the "before and after rule" to compute compensation for a partial taking was recently upheld by this court in *Hanson* v. *Commissioner of Transportation,* 176 Conn. 391, 400, 408 A.2d 8 (1979). This court has also held that where only a portion of a tract is taken for public use, the award will include the value of the part taken as well as any damages visited upon the remainder as a result of the taking. *Corbin Development Co.* v. *Commissioner of Transportation,* 176 Conn. 63, 67, 404 A.2d 882 (1978); *D'Addario* v. *Commissioner of Transportation,* 172 Conn. 182, 184, 374 A.2d 163 (1976). These principles of Connecticut law on the assessment of damages for a partial taking reflect the judicial philosophy that just compensation requires that the condemnee shall be put in as good a condition pecuniarily as he would have been in had the property not been taken. *Meriden* v. *Ives,* 165 Conn. 768, 773, 345 A.2d 13 (1974); *Slavitt* v. *Ives,* 163 Conn. 198, 209, 303 A.2d 13 (1972).

We have stated many times that no one method of valuation is controlling in the trier's determination of just compensation. The trier may select the one most appropriate to the case before him in arriving at his own conclusion as to the value of a land interest. He may weigh the opinions of the appraisers, the claims of the parties in light of all

the circumstances in evidence which bear on value, and his own general knowledge of the elements which pertain to value. *Slavitt v. Ives,* supra; *Birnbaum v. Ives,* 163 Conn. 12, 18, 301 A.2d 262 (1972); *Connecticut Printers, Inc.* v. *Redevelopment Agency,* 159 Conn. 407, 414, 270 A.2d 549 (1970); *Brothers, Inc.* v. *Ansonia Redevelopment Agency,* 158 Conn. 37, 43–45, 255 A.2d 836 (1969).

The commissioner does not challenge the referee's reliance on the before and after rule in determining what is just compensation for Laurel, except insofar as the referee considered the profits Laurel lost on the project as a result of the taking. The commissioner claims that the $1,051,900 lost profits included in Laurel's compensation was awarded contrary to Connecticut law and was speculative and conjectural. We first consider the claim that the award of lost profits is contrary to Connecticut law.

The commissioner relies on *Eljay Realty Co.* v. *Argraves,* 149 Conn. 203, 207, 177 A.2d 677 (1962), along with two well respected treatises in the field of eminent domain, 4 Nichols, Eminent Domain (3d Ed.) §§ 12.3121 [1], [2], pp. 12-202–12-204, and 1 Orgel, Valuation under Eminent Domain (2d Ed.) § 162, pp. 655–56, which state the general rule that neither past nor estimated future profits of a business are reliable evidence of the value of land on which the business is located. Jahr, Eminent Domain § 150, p. 232–33 is also in accord. We do not disagree with the general rule. Indeed, we find the reasons which underlie the rule are sound. Evidence of business profits to be realized in the future may be too speculative. *Tandet v. Urban Redevelopment Commission,* 179 Conn. 293, 301, 426 A.2d

280 (1979). Furthermore, it is the land which is to be appropriated, not the business. Provided the condemnee is compensated for his land, building and appurtenances thereto, and provided the trier has considered "the use which is being made of the property if, in truth, that use of the property enhances its value"; *Feigenbaum* v. *New Britain Housing Site Development Agency,* 164 Conn. 254, 258, 320 A.2d 824 (1973); *Brothers, Inc.* v. *Ansonia Redevelopment Agency,* supra, 43–44; *Seferi* v. *Ives,* 155 Conn. 580, 583–84, 236 A.2d 83 (1967), appeal dismissed, 391 U.S. 359, 88 S. Ct. 1665, 20 L. Ed. 2d 640 (1968); *Housing Authority* v. *Lustig,* 139 Conn. 73, 76, 90 A.2d 169 (1952); *Harvey Textile Co.* v. *Hill,* 135 Conn. 686, 688, 67 A.2d 851 (1949); *State* v. *Suffield & Thompsonville Bridge Co.,* 82 Conn. 460, 468, 74 A. 775 (1909); it is reasonable to assume that the condemnee has received just compensation for the taking and can begin anew, his good will and business reputation intact, in a different location. This reasoning is consistent with the principle that just compensation shall put the condemnee in as good a position pecuniarily as he would have been in had the property not been taken.

In *Feigenbaum,* supra, 257–58, this court upheld the trial court's determination of just compensation for the taking of the plaintiff's property in downtown New Britain where he had operated a scrap-metal business since 1919. The court upheld the trial court's award based on the plaintiff's use of the land for a special purpose. Since the highest and best use of the property would be its continued use as a scrap-metal yard and since a willing buyer would pay and a willing seller would receive money on the basis of the property's worth as a scrap-metal yard, there was no error in the court's deter-

mination of just compensation on that basis. Id., 259–61. In *Brothers, Inc.,* supra, 44, this court upheld the trial referee's determination of just compensation in similar circumstances. There, we said: "If, as the plaintiff claims, its junk business was safely ensconced in a desirable location and no other like location was available in the vicinity to which it might move, those factors were surely ones which both the owner and a prospective purchaser desirous of conducting a similar business on the property would consider in negotiating a sale price." In *Seferi,* supra, 583-84, this court adopted the same reasoning to reduce a condemnation award which erroneously included the value of the condemnee's retail grocery business located on the taken land. The court reduced the amount of the award by the value of the business, but left intact a sum which reflected the use of the land. In *Housing Authority* v. *Lustig,* supra, 76, this court upheld an award of just compensation based on similar considerations with regard to the condemnee's operation of a poultry slaughtering operation on the taken land. The court recognized that "[t]he business of slaughtering poultry is not one which may properly be conducted in every neighborhood. Locations suitable for it are relatively few. . . . The property could well have been found to be worth more to a potential buyer because it had been devoted to that use. Moreover, in view of the difficulty which the owner would be likely to have in finding another location suitable for his operations, he would be reluctant to sell, and that would be a factor in determining the fair market value of the property." Id., 78. The court upheld the committee's assessment of damages which was premised in part upon "the nature of the business."

*Id.* In *Harvey Textile Co.,* supra, 690, the court held that the condemnee's expense incurred in moving machinery from the condemned property was properly considered in the determination of value because that expense would be considered by the owner in fixing a price at which he would be willing to sell. In *State* v. *Suffield & Thompsonville Bridge Co.,* supra, 467, the court endorsed the committee's consideration of the condemnee's use of the land for a toll bridge and the profits it had realized therefrom. The holding of that case has been distinguished in *Eljay Realty Co.* v. *Argraves,* 149 Conn. 203, 207, 177 A.2d 677 (1962), which is relied on by the commissioner here, on the grounds that the owner of the bridge was the operator of the business conducted on it and the business could not be located elsewhere. *Id.,* 208.

The trial court's finding clearly indicates that Laurel intended to use and had already expended considerable effort and money in using the Fairfield property for the development of the Villager Condominium project. In view of the total cost, total value and total profits estimated by the commissioner's own appraiser, the referee's consideration of the use which was being made of the property was proper because that use certainly enhanced its value. *Feigenbaum,* supra, 258, and cases cited therein. Laurel's circumstances are markedly different from that of the lessee in *Eljay Realty Co.,* supra. There the lessor condemnee sought to introduce evidence of net income realized by its lessee from the excavation of sand and gravel on the land as an element for the referee to consider in assessing the fair market value of the lessor's land. The court held that the trial referee's consideration of the lessee's future profits from operating the business

on the land was improper. There are several reasons why the general rule on inadmissibility of evidence of future profits was appropriately applied in that case. First, the plaintiff landowner was compensated for the land with an award based on the referee's finding that the sand and gravel processing business was the "highest and best use" to which its land could be put. Id., 205. The lessee's remedies for premature termination of his lease were against the lessor who could no longer perform the terms of the lease contract on the taken land. Moreover, the lessee, once compensated by the lessor for damages incident to the termination of the lease, could move to another site and begin anew in the same business. Laurel, on the other hand, was both landowner and enterpreneur, as was the scrap-metal dealer in *Feigenbaum*, supra; the junk dealer in *Brothers, Inc.*, supra; the grocer in *Seferi*, supra; the poultry slaughterer in *Housing Authority* v. *Lustig*, supra; the textile manfacturer in *Harvey Textile Co.*, supra; and the toll bridge operator in *State* v. *Suffield & Thompsonville Bridge Co.*, supra, and Laurel's business was the land. Upon completion of the Villager Project, Laurel intended to sell the units as condominiums, as authorized by the special permit. The trial court found that at the time of the taking, January 23, 1974, there was a market for sale by Laurel of its partially completed condominium project. This finding is not attacked by the commissioner. It would be naive and unrealistic to assume that a willing buyer would not pay some portion of the anticipated profit on the partially completed project in view of the effort and expense Laurel had already incurred. It would also be contrary to Connecticut law to ignore the enhancement in value which Laurel's partial com-

pletion of the project had created, an enhancement which any application of the before and after rule must recognize. The referee's finding that the likelihood of Laurel obtaining a revised special permit after the taking was nil, as substantiated by the testimony of the town planner,[9] amply supports the referee's inclusion of an element of lost profits on the aborted project as an element of value which Laurel created by enhancements to the land in the award of compensation.

The commissioner also attacks the award of lost profits as speculative and conjectural. In *Tandet* v. *Urban Redevelopment Commission*, 179 Conn. 293, 300–301, 426 A.2d 280 (1979), this court held that the referee's reliance on the plaintiff's before-taking valuation of his property was in error because the valuation was not predicated on the existing use of the land but on some higher and better, more lucrative use to which the property could be converted at a future date. The court said that the use of the property to be considered in determining just compensation " 'must be so reasonably probable as to have an effect on the *present market value of the land*. Purely imaginative or speculative value should not be considered.' . . . In the absence of such a showing, evidence of the proposed use is too remote and speculative to have any legitimate effect upon the valuation . . .

[9] Earl Rush, planning director for the town of Fairfield, testified that with respect to a new application for a revised special permit, he could foresee at least two new issues, not considered in Laurel's first application, namely the traffic problem created by plans to mix access to the condominium project with the on-off ramps for the parkway, and the wetlands regulations. Rush also testified that the town's first selectman declared a moratorium on condominiums in 1973 and that no condominiums were approved between 1973 and 1977.

and hence, should not be admitted for that purpose." (Citations omitted.) *Tandet* v. *Urban Redevelopment Commission,* supra, 300. There is no question, in light of the finding, that Laurel fully intended to complete development of the Villager Condominium project on the land as soon as possible, to sell the units upon completion and to realize a profit therefrom. The sale price would include the element of profit. The corporation had already incurred considerable expense and effort in completing the project and this portion of the finding is not attacked by the commissioner. Furthermore, the commissioner's own appraiser testified that the difference between his estimate of the property's fair market value on the date of the taking and that of Laurel's appraiser was the result of their differing opinions with respect to what percentage of the total profit a prospective buyer would be willing to pay Laurel. The total estimates of the two appraisers were nearly equal; Laurel's appraiser estimated total direct and indirect costs at approximately $4.7 million, whereas the commissioner's appraiser estimated them at approximately $5 million. In view of the progress Laurel had made on the project as of the date of the taking, it cannot be said that the evidence showed that Laurel's proposed use of the land and the profits to be derived therefrom were too remote and speculative to have any legitimate effect upon valuation. Nor can it be said the referee's allocation of 50 percent of the profit to Laurel as a willing seller was unfair. The commissioner's appraiser allocated 20 percent of the profit to Laurel; Laurel's appraiser allocated 80 percent. The referee's compromise at 50 percent is equitable, particularly in light of the

difficulty, as established by the findings, a willing buyer would have in purchasing a similar condominium project.

The commissioner advances one final claim of error with regard to the referee's determination of just compensation. If the referee's award is upheld, he argues Laurel will receive 95.18 percent of the before-taking value of the property or $2,706,800, despite the fact that the state has taken only 4.82 percent of its land. The commissioner claims that this cannot be considered just compensation from the point of view of the taxpaying public who must pay for the taken land and that a more equitable result would be to award the remaining 9.32 acres to the commissioner and the $130,000 after-taking value to Laurel along with the $2,535,100 already awarded for the 0.38 acre strip. We note at the outset that this argument completely contradicts the claims advanced by the commissioner in *Laurel I* where he asserted that taking the 0.38 acre strip did not result in inverse condemnation of the remaining 9.32 acres. There we said (p. 203) that without a special permit approving the construction of condominiums, Laurel could develop the remaining land for use as residence R-3 district with access to Toll House and Stevenson Roads. There we acknowledged "that the remaining land will not be potentially as productive as it was at the time of the taking and that the evaluation of severance damages to the plaintiff's property, no doubt, will be substantial, but the remaining property is not worthless or unavailable for such uses as the zoning regulations will allow." Id., 203–204. It is clear that both parties were aware of the great disparity in value, by virtue of the terms of the special permit, between the taken strip and the remaining tract. Yet the

commissioner argued and the court agreed that the state had taken no more than the 0.38 acre strip. The commissioner's argument comparing the percentages of value paid for land acquired assumes that the constitutional requirement of just compensation embodies a pro rata principle that renders suspect an award of substantial severance damages for a relatively small portion of the taken property. This certainly cannot be the case where the taking deprives a landowner of all access to the remainder for the use for which the land was intended. Furthermore, there is no evidence to show that the remaining 9.32 acre tract is worth more to Laurel than it would be to the commissioner. Although the taking left Laurel with the lion's share of the property, its use has been severely restricted and its profitability greatly reduced as a result of the taking and the resultant effect on the special permit. There is no error in the trial referee's refusal to accept this claim of law asserted by the commissioner.

### III

Both parties assign error to the court's determination of the rate of interest to be awarded on Laurel's compensation. In its finding on Laurel's cross appeal, the trial court found that a fair and reasonable overall average interest rate which a reasonably prudent investor could have obtained in Fairfield County on January 23, 1974, based on prevailing interest rates at that time,[10] was 8.17 percent per annum. The court also found that

---

[10] The court considered interest paid on passbook savings, certificates of deposit, corporate and utility bonds, state-wide home mortgage rates, construction mortgage loans, treasury bills and notes, and delinquent property taxes.

Laurel's three construction mortgages, which were obtained at rates of 8.5, 8, and 12 percent, were most fair and reasonable, more than fair and reasonable, and favorable, respectively, in the Fairfield County area in January, 1974. The court concluded that the 6 percent per annum statutory interest rate on civil judgments[11] was not fair, just and reasonable and that a rate of 8.17 from the date of the taking to the date of payment would render the compensation award fair and just. Nevertheless the judgment makes no provision for interest at a rate other than that provided by the statute.

Laurel assigns error in the trial court's decision to overrule its claim of law that Laurel was entitled to 8.17 percent interest on the award. The provision for interest in a condemnation award rests on equitable principles. *Seaboard Air Line Ry. Co.* v. *United States,* 261 U.S. 299, 304, 43 S. Ct. 354, 67 L. Ed. 664 (1922). In view of the near eighteen month delay in the payment of compensation created by Laurel in its prosecution of the inverse condemnation proceedings which led to our opinion in *Laurel I,* supra, it cannot be said that the referee's award which included costs, appraisal fees and interest from the date of the taking to the date of payment did not include "an additional sum which is 'an amount sufficient to produce the full equivalent of that value paid contemporaneously with the taking.'" *E. & F. Construction Co.* v. *Ives,* 156 Conn. 416, 420, 242 A.2d 768 (1968), quoting *United States* v. *Klamath & Moadoc Tribes of Indians,* 304 U.S. 119, 123, 58 S. Ct. 799, 82 L. Ed. 1219 (1937);

---

[11] On the date of the taking, General Statutes § 37-3a provided in part: "Interest at the rate of six per cent a year, and no more, may be recovered and allowed in civil actions."

*Jacobs* v. *United States,* 290 U.S. 13, 17, 54 S. Ct. 26, 78 L. Ed. 142 (1933); *Seaboard Air Line Ry. Co.* v. *United States,* supra.

There is no error.

In this opinion the other judges concurred.

## Appendix

