[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The defendant, pursuant to General Statutes section 22a-25, and acting by and through the State Comptroller under the authority of General Statutes section 48-12, acquired a permanent easement by eminent domain on and over 10,890 square feet of the premises owned by the plaintiffs, Leroy H. Favrow and Lucy M. Favrow, and known as No. 440 Main Street, Newington, Connecticut, for the construction, maintenance, improvement, repair and/or replacement of a flood control project commonly known as Piper/Mill Brook Flood Control Project, Newington, Connecticut, on April 19, 1989. Damages assessed by the defendant in the amount of $4800 have been deposited with the clerk of the court, where said sum still remains.
The permanent easement acquired by the defendant contains 0.25 of an acre, or approximately 75% of the lot area known as No. 440 Main Street, and is shown as Parcel 10-20 on a map entitled: "Map of Land to be Acquired by the State of Connecticut, Department of Environmental Protection, Piper and Mill Brooks, South Branch of the Park River Watershed Project, Newington, Connecticut, January 1987, Scale 1" = 50', Sheet 8. Strauss Engineering Associates, Inc., Mervyn F. Strauss, L.S., President."
A more particular description is as follows: Commencing at a point on the easterly street line of Main Street at the remaining land of the plaintiffs, thence running N 74 degrees 30' 31" E along the remaining land of the plaintiffs a distance of 189.77 feet to a point at land n/o/f/o Arthur Olesen and Jessie S. Olesen; thence running S 33 degrees 31' 28" W along land of the State of Connecticut a distance of 60.00 feet to a point; thence running, southwesterly along a curve to the right whose radius is 136.88 feet along land of the State of Connecticut a distance of 126.00 feet to a point; thence running S 86 degrees 15' 57" W along land of the State of Connecticut a distance of 45.40 feet to a point at the easterly street line of Main Street; thence running N 00 degrees 51' 57" E along the easterly line of Main Street a distance of 47.26 feet to a point; thence running N 00 degrees 10' 27" E along the easterly line of Main Street a distance of 16.04 feet to the point and place of beginning.
The plaintiffs, pursuant to General Statutes section 8-132, on July 10, 1989, appealed from the defendant's assessment of damages as inadequate under the law. A year later, on July 12, 1990, the plaintiffs sought leave to file an "Amended Appeal and Application for Review of Statement of Compensation and Claims for Other and Further Relief." The defendant objected to this request on the ground that it sought to add new issues to the proceeding to the prejudice of the state. The court (Freed, J.) CT Page 6069 overruled the objection and allowed the amendment. In this pleading the plaintiffs alleged a second count claiming damages for an inverse condemnation and seeking, pursuant to General Statutes Section 48-17b, reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred in these proceedings. In addition, the plaintiffs claimed damages in tort to their adjoining property caused by the construction activities of the defendant's servants, agents, employees and contractors.
The following facts are relevant to this proceeding: On June 12, 1985, the plaintiffs acquired by warranty deed two parcels of land situated in Newington and known as Nos. 434 and 440 Main Street. No. 434 Main Street contains their single-family home and has a frontage of 75 feet. It is bounded northerly 225 feet; easterly 74.9 feet; southeasterly 35 feet; southerly by the subject premises, No. 440 Main Street, 183 feet; and westerly by Main Street 75 feet. No. 440 Main Street, being a vacant lot adjoining the home lot on the south, has a frontage of 103.3 feet. It is pie-shaped on the south and east borders, following, the bend in Mill Brook as its water flows from Main Street, first in an easterly direction, then northeasterly onto and across Lot No. 434 Main Street. The subject premises are bounded northerly by No. 434 Main Street, 183 feet; easterly and southerly 231.40 feet; and westerly by Main Street 103.3 feet.
The property to the south and east of the subject premises and to the southeast, in part, of No. 434 Main Street, are portions of a subdivision of eight lots established in 1939 and known as "Mountain View Heights." The parcels of land now known as Nos. 434 and 440 Main Street were then owned by the developer and are shown on the tract survey. This map depicts that Mill Brook, which formerly flowed northerly and easterly through the center of these plots of land, was relocated to its present course so that it would run over the southerly and easterly portions of what is now No. 440 Main Street and the rear or easterly part of what is now No. 434 Main Street. At some points of Nos. 434 and 440 Main Street, and depending on the brooks' water flow, the plaintiffs' dry land extends beyond the brook's banks.
On December 31, 1951, a building permit was issued to Mountain View, Homes, Inc., for the construction of a single-family dwelling, 34 feet by 24.33 feet in size, with a detached garage, 21 feet by 12 feet in size, on lot No. 434 Main Street. A certificate of occupancy was granted on July 29, 1952. This is the home now owned and occupied by the plaintiffs adjacent to the subject property.
On or about January 17, 1952, another building permit was issued to Mountain View Homes, Inc., the developer of the subdivision adjoining the subject premises, for the construction of a similar dwelling and garage on Lot No. 440 Main Street. For reasons not evident, this permit was later withdrawn and construction plans were abandoned. Subsequently, the residence and lot at. "No. 434 Main Street" were acquired by the plaintiffs as the "FIRST PIECE," and the extra lot at "No. 440 Main Street" as the "SECOND PIECE," in their purchase of the premises six years ago. CT Page 6070
By their deed the plaintiffs acquired two separate parcels of land, No. 434 Main Street with a house erected thereon, and an adjacent building lot known as No. 440 Main Street. The second lot "No. 440 Main Street" is so identified in the land records and in the plaintiffs' deed by the house number assigned and reserved on the town records for any future dwelling erected thereon. It was their understanding that the extra lot was available for building upon the obtaining of necessary permits. Even though they had no existing plans for building on the lot at the time of taking, they considered they were the owners of an extra building lot available for that purpose by their deed for which they had paid consideration. Their deed was taken "subject to any and all provisions of any ordinances, municipal regulation or public or private law," confirming that the two pieces of property were subject to the appropriate regulations of the law.
Lot No. 440 Main Street is located in an R-12 Residential Zone, which permits the construction of a one-family detached dwelling with accessory uses and structures. The relevant minimum requirements for this zone are as follows: lot area 12,000 square feet; and lot frontage 80 feet. Before the taking the lot was conforming. Its area was 14,490 square feet and the frontage was 103 feet. The taking of the permanent easement of 10,890 square feet reduced the lot area by 75% to 3600 square feet, and the lot frontage to 40 feet, making the lot grossly nonconforming and a variance for possible residential use unattainable.
Since the enactment of "The Inland Wetlands and Watercourses Act," General Statutes sections 22a-36 — 22a-45, in 1972, and the adoption of the Newington Inland Wetlands and Watercourses Regulations in 1976, the premises No. 440 Main Street has been classified as a flood plain or flood hazard area. By virtue of this classification, it then became subject to these laws and regulations, as well as to the further requirements of the zoning ordinance pertaining to such areas coordinately enacted.
Section 4.4.7 of the zoning regulations provides that no principal building shall be constructed within 50 feet of a regulated wetland or watercourse as shown on maps thereof. Section 6.3 contains the regulations pertaining to flood plain areas. These provide that a special permit shall be obtained from the Newington Town Plan and Zoning Commission before construction may take place within any flood hazard area. As a condition precedent, a permit must first be obtained from the Newington Conservation Commission, acting as the town's Inland Wetlands and Watercourses Agency, which must consider the reports of relevant federal and state agencies in its decision. An important requirement for construction of a dwelling in a flood plain area is that all living areas, including the basement, must be at least one foot above the one hundred year flood level.
Wayne Thomas Bell, the chief building official and zoning, administrator of the Town of Newington, and the authority for issuance of building permits, testified for the plaintiffs. His testimony was preceded by correspondence in evidence predating the taking. On January 27, 1989, he CT Page 6071 wrote the plaintiffs that after all inspection of the properties Nos. 434 and 440 Main Street, an examination of the land records, and a review of the building records of his office, it was his opinion "that at this time the lot known as 440 Main Street could be separated from your house lot known as 434 Main Street and a dwelling could be erected on it. . . . keeping in mind the restrictions for basement and finish floor grade levels that would have to be maintained to be above flood levels and furnished with the required engineering data that we would need, I believe that, at this time, you could obtain a building permit for this parcel of land."
In a subsequent letter on February 15, 1989, he stated further: "If this [proposed taking] of land is acquired by [the State of Connecticut] in the proposed Piper/Mill Brook Flood Control Project, you will no longer have a building lot since any remaining land will not meet any of the zoning requirements for a building lot and any value placed on it at this time will be lost with the taking."
In his testimony at trial, Mr. Bell concluded that as of the taking on April 19, 1989, there was a reasonable probability that all necessary approvals and permits would have been granted for a building permit to construct a dwelling similar to that as located and approved in the earlier building permit granted on January 17, 1952, to Mountain View Homes, Inc., by slab construction on grade without a basement. Fill would be necessary to obtain and maintain the required grade of one foot above the one hundred year flood level.
In his professional opinion based on his experience as a building and zoning official of Newington, it is reasonably probable that the flood plain and zoning requirements would not be especially difficult to meet. He has seen similar construction allowed under comparable conditions. There is nothing dissimilar about the lot at No. 440 Main Street from these instances. In particular, he cited the example of Millbrook Condominiums constructed in the same flood plain, and which must be approached by a bridge over the brook.
After the taking, it was Mr. Bell's conclusion that no building permit is attainable with the permanent easement on the subject property. No construction may take place in the town on any permanent easement above or under the ground. The taking of 10,890 square feet extends to 75% of the subject lot. The area of 3600 square feet, or 25%, remaining to the plaintiffs unencumbered is insufficient to qualify as a building lot.
Mr. Charles E. Berger, Jr., Assistant Director of the Flood Management and Dam Safety Section of the Water Resources Unit of the Connecticut Department of Environmental Protection, testified as an expert witness for the defendant relative to the flood control project for which the condemnation proceedings were undertaken. His technical data pertaining to the subject property supports the findings and conclusions of Mr. Bell. According to the data testified to by Mr. Berger, a dwelling meeting the zoning and flood plain regulations could have been constructed on a slab CT Page 6072 with the upgrading of the lot level by fill before the taking of the easement.
The flood control project consists of two phases, the widening of the brook channel and the control of soil erosion. He testified that as a result of the project, after its completion in two years, the flooding on the plaintiffs' land will be reduced by 1.8 feet in a one hundred year flood, thereby benefiting their property. The one hundred year flood line is at the 54' grade elevation. The projected reduction of flood waters would lower that to about 52', thereby decreasing flooding and soil erosion along Mill Brook and the plaintiffs' property. Lot No. 440 Main Street, as depicted on the National Geodetic Survey Vertical Datum of 1929, has a grade elevation above the level of the brook of 50' to 54'.
The plaintiffs' appraiser testified that in his opinion the highest and best use of the property No. 440 Main Street is as a single-family residential building lot. In his appraisal he utilized the sales comparison approach. After comparing three recent lot sales in town, he found the before taking value of the subject property to be $55,000. In reaching this conclusion he allowed for the cost of fill and other expenses that would be required to build on this lot. His appraised value of the property after the taking being $3500, he found the damages to be $51,500.
The defendant's assessment of damages was based upon the second report of its appraiser. The first report, dated September 7, 1987, over seventeen months before the taking, was predicated upon the taking of the fee to about 0.481 acres, being the rear of No. 434 Main Street and all but the northwest corner of No. 440 Main Street, leaving total land of about 0.219 acres with the single-family dwelling No. 434 Main Street. The highest and best use he found to be residential use.
Using the comparable sales approach, he estimated the market value of the entire property at Nos. 434 and 440 Main Street before the taking to be $159,500. The after taking value was then determined by him to be $140,000, resulting in damages of $19,500. This proposed taking, however, was abandoned later by the defendant. Instead, the defendant substituted the condemnation proceedings now before the court.
The defendant's appraisal in this case was made as of April 11, 1988, one year before the taking. The two parcels of land, Nos. 434 and 440 Main Street, were again considered to be a single lot having a frontage of 178 feet and an area of 30,492 square feet, or 0.7 acres. This report consisted of an addendum to the earlier valuation and was predicated upon it. The before taking value of September 7, 1987, in the amount of $159,500 was adopted for the "before and after" formula in the computation of damages. The highest and best use continued to be residential.
The comparable sales at this time, however, consisted of four land sales as follows: (1) $6.65 per square foot of 0.25 acres with 100 feet frontage; (2) $0.50 per square foot of 2.73 acres; (3) $1.43 per square foot CT Page 6073 of 39,998 square feet with right of way to lot; and (4) $0.50 per square foot of 66,332 square feet of unimproved land. With unspecified adjustments "for time of sale, physical as well as locational differences," he valued the plaintiffs' two improved lots at $1.75 per square foot for a total of the $53,500 before the taking. Deducting this sum from the total value of the premises, he determined the value of the dwelling to $106,000 without making any specific appraisal of it and the attached garage.
The after taking value was calculated to be the same as the before value, namely, $1.75 per square foot. The permanent easement was valued at 75% of that amount, or by calculation: 10,890 square feet x $1.75 x 75% = $4764. Deducting this amount from the total land value before the taking of $53,500, he estimated the value of the total site or land after the taking to be $48,700. Adding this land value to his computed building value of $106,000, he calculated the estimated value of the plaintiffs' whole property after the taking to be $154,700. Subtracting this sum from his before taking value of $159,500, he found the plaintiffs' damages to be $4800.
A state referee sitting as a court on appeals in condemnation cases is more than just a trier of fact or an arbitrator of differing opinions of witnesses. He is an arbiter charged by the General Statutes and the decisions of our courts with the duty of making an independent determination of value and fair compensation in the light of all circumstances, the evidence, his general knowledge and his viewing of the premises. Minicucci v. Commissioner of Transportation, 211 Conn. 383, 388 (1989); Birnbaum v. Ives, 163 Conn. 12, 21-22 (1972); Feigenbaum v. Waterbury,20 Conn. App. 148, 153 (1989). It is his task to reach a result that gives, as nearly as possible, a fair equivalent in money as just compensation for the property taken. Mathis v. Redevelopment Agency, 165 Conn. 622, 623
(1973); Feigenbaum v. Waterbury, supra, 153-54.
One factor to be considered is the so-called highest and best use of the property or its most advantageous use. The "highest and best use" concept, chiefly employed as a starting point in estimating the value of real estate by appraisers, has to do with the use which will most likely produce the highest market value, greatest financial return, or the most profit from the user of a particular piece of real estate. Connecticut Printers, Inc. v. Redevelopment Agency, 159 Conn. 407, 411 (1970).
Both appraisers are in agreement that the highest and best use of the subject property is for residential purposes. The plaintiffs' appraiser, however, considered such residential use in the context of No. 440 Main Street as a separate and distinct building lot as subdivided about 1939, and thereafter transferred as the "SECOND PIECE: No. 440 Main Street" in the chain of title to the plaintiffs. On the other hand, the defendant's appraiser disregarded the subdivision and title history of No. 440 Main Street, and considered the highest and best use of No. 440 Main Street in the context of a single lot in conjunction with the house lot at No. 434 Main Street. CT Page 6074
An instrument conveying an interest in land conveys only that which is specifically expressed in the document. The language of the notice of condemnation in this case is unambiguous in its description of the property at issue as an easement. The plaintiffs have retained substantial beneficial rights to the property. They can make full use of the easement area for their own purposes, provided that those users are not inconsistent with the defendant's easement. Alemany v. Commissioner if Transportation,215 Conn. 437, 442 (1990). Title to the fee simple interest remains in the plaintiffs. Id., 443.
When only a portion of a party's property is taken, the landowner is entitled nor only to compensation for the value of the property taken, but also for the diminution in the value of the landowner's remaining property that the severance of a portion of the property causes. To ensure that severance damages are included in the trial court's assessment, damages should be calculated by the "before and after rule," under which the proper measure of damages is the difference between the market value of "the whole tract" as it lay before the taking and the market value of what remained of it thereafter, Id., 444-45.
The fair market value is the price that the trier reasonably thinks would result from fair negotiations between a willing seller and a willing buyer, contemplating the highest and best possible use of the land, giving a prudent investor the greatest financial return. In applying the "before and after rule" in a partial taking to determine the difference between the market value of the whole property as it lay before the taking and the market value of what remained of it thereafter, the trier must take into consideration the changes contemplated in the improvement and those which are so possible of occurrence in the future that they may reasonably be held to affect market value. D'Addario v. Commissioner of Transportation,180 Conn. 355, 365 (1980). Such an award will include the value of the part taken as well as any damages visited upon the remainder as a result of the taking. Laurel, Inc. v. Commissioner of Transportation, 180 Conn. 11, 37
(1980).
The case of Minicucci v. Commissioner of Transportation, 211 Conn. 382
(1989) gives analytical direction for this court to take in assessing the plaintiffs' damages. In Minicucci the property taken was in single-family residential zone and consisted of 9.5 acres of a 13.65 acre parcel having a frontage of 1370 feet on route 6 in Bolton. At the time of taking, the property was undeveloped, heavily wooded and rose sharply 125 feet from the existing highway grade. In addition, the parcel contained wetlands and was spiraled through with a rock ledge formation. The plaintiffs claimed that the trial referee erred by refusing to value the property before taking based upon its potential for subdivision into residential building lots. The Supreme Court did not agree.
Quoting 4 P. Nichols, Eminent Domain (3d Ed.) Section 12.3142 [1][a], pp. 12-355-356, the court, at page 385 stated: "[C]ourts have uniformly CT Page 6075 adopted the approached that raw land as such, with little or no improvements or preparation for subdivision may not be valued as if the land were in fact a subdivision . . . . The accepted rule for the evaluation of such land, therefore, is that the land will be considered in its present condition as a whole, with consideration given to any increment or enhancement in value due to the property's present adaptability to subdivision developments."
"In determining its highest and best use the trial referee must consider whether there was a reasonable probability that in the reasonably near future the subject property will be subdivided. Budney v. Ives,156 Conn. 83, 239 A.2d 482 (1968). The trial referee must make this determination not only from the testimony and physical evidence presented, but also from his or her own personal observation of the property. See General Statutes Section 13a-76." Minicucci v. Commissioner of Transportation, supra, 385. "`Where the use appears to be subject to certain restrictions or limitations the trier must first determine whether these impediments do in fact exist and if so whether it is reasonably probable that they may be removed in the near future.' Mazzola v. Commissioner, [175 Conn. 576,] 582. This being the case, we conclude that the trial referee clearly acted within his broad discretion in these matters in rejecting the claim that the property should be valued as subdividable."
In view of the subdivision about 1939 creating a separate building lot identified as No. 440 Main Street; the identification of No. 440 Main Street by the house number assigned and reserved on the town records for any future dwelling constructed thereon; the issuance of a building permit on or about January 17, 1952, to Mountain View Homes, Inc., the developer of the subdivision adjoining the subject premises, for the construction of a dwelling and garage on the lot; t; the title history of No. 444 Main Street as the "SECOND PIECE" in the chain of title by which the plaintiffs obtained their property; the testimony of Wayne Thomas Bell, the chief building official and zoning administrator and authority for the issuance of building permits, that there was a reasonable probability at the time of taking that all necessary approvals and permits would have been granted for a building permit to construct a dwelling, similar to that as located and approved in the earlier building permit granted in 1952, by slab construction on ground level with the addition of fill; the technical data furnished by Charles E. Berger, Jr., supporting that a building meeting the zoning and flood plain regulations could be constructed on a slab with the upgrading of the lot level by fill; the testimony of Mr. Berger that after the completion of the flood control project in two years, the flooding in the plaintiffs' land will be reduced by 1.8 feet in a one hundred year flood; the title history of No. 440 Main Street as a separate lot; the depiction of No. 440 Main Street as a separate lot in all surveys prepared and used by the defendant in these proceedings, and a personal inspection and viewing of the property, the court finds that the highest and best use of the subject premises No. 440 Main Street at the time of taking was for residential purposes as a single building lot separate and distinct from the "FIRST PIECE: No. 434 CT Page 6076 Main Street."
In the performance of my duties in this appeal, I find that the before taking value of the subject property No. 440 Main Street was $55,000, and that the after taking value is $13,700. Damages, therefore, are assessed at $41,300.
The second count claiming damages for a alleged inverse condemnation and seeking, pursuant to General Statutes section 48-17b, reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred in these proceedings, as well as alleged damages in tort to the plaintiffs' adjoining property caused by the construction activities of the defendant's servants, agents, employees and contractors is dismissed, suo motu.
This appeal from the assessment of damages by the defendants has been taken under the provisions of General Statutes section 8-132. See also General Statutes sections 22a-25 and 48-12. Under these statutory terms, it is limited in scope only to "a review of such statement of compensation." It is not unlike its cousins, appeals in highway condemnation cases under General Statutes section 13a-76. "Sec. 13a-76 of the General Statutes sets forth the limited scope of the instant appeal, namely, the reassessment of damages resulting from the taking, which the Court determined took place on June 15, 1972. `. . . a condemnation proceeding is limited under section13a-76 of the General Statutes to a reassessment of damages caused by the taking. . . .' Plunske v. Wood, 171 Conn. 280, 370 A.2d 920 (emphasis added)." St. John v. Commissioner of Transportation, 172 Conn. 234, 240
(1977).
"This complaint represents an entirely improper misjoinder of proceedings for relief." Munson v. MacDonald, highway Commissioner,113 Conn. 651, 660 (1931).
Judgment may enter for the plaintiffs in the amount of $11,300, less $4800 deposited with the clerk of the court to the credit of the plaintiffs, or an excess of $36,500, with interest on such excess from the date of taking to the date of payment, together with costs, and a reasonable appraisal fee of $350.
William C. Bieluch State Trial Referee