[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an appeal by Elio Capuano, Daniel J. Ferraina and James R. Silvester, d/b/a The CFS Group, of Windsor, from the assessment of damages in the amount of $300,000 paid by the defendant for the partial taking by eminent domain on September 23, 1988, of their property known as Nos. 1 and 10 Univac Lane, in the Town of Windsor, for the layout, alteration, extension, widening, change of grade, drainage and improvement of the highway commonly known as Interstate Route 91 pursuant to Sections13a-73(b), (e) and (f) of the General Statutes.
The plaintiffs' property before the taking consisted of an irregularly shaped parcel of land containing approximately 11.46 acres of land improved with two office buildings known as Nos. 1 and 10 Univac Lane. No. 1 Univac Lane allegedly contains approximately 94,680 square feet of gross floor space, and No. 10 Univac Lane contains approximately 46,908 square feet, for a combined total of 141,588 square feet. The property is subject to a 50 foot permanent right of way for Univac Lane in favor of the Town of Windsor. Appurtenant to the property is a 20 foot wide sewer and drainage easement of about 110 feet in length over land n/o/f/o Exxon Company.
The property has a frontage of 132.03 feet along the southerly line of Bloomfield Avenue, and non-access frontage of 1141.82 feet along the westerly highway line of I-91. The site has a rolling topography with terraced areas around the buildings. It is in a Restricted Commercial (RC) zone.
The premises taken are described as follows:
Parcel No. 1 located southerly of Bloomfield Avenue, on the westerly CT Page 8319 side of Interstate Route 91, containing about 0.391 of an acre;
Parcel No. 2 located southerly of Bloomfield Avenue, on the westerly side of Interstate Route 91, containing about 0.283 of an acre; a portion of this taking consisted of 0.08 of an acre of a detention basin along the easterly border of the plaintiffs' land; and
Parcel No. 3 located on the southerly side of Bloomfield Avenue, containing about 0.085 of an acre.
Said three parcels contain a total area of about 0.759 of an acre, together with all appurtenances, all of which more particularly appear on a map entitled: "Town of Windsor, Map Showing Land Acquired From Elio Capuano et al by The State of Connecticut, Interstate Route 91 (Limited Access Highway), Scale 1" = 40', Robert W. Gubala, Transportation Chief Engineer — Bureau of Highways. (164-177-44)."
These premises were taken together with the following easements and rights upon portions of the remaining land, as more particularly shown on said map:
(1) A full and perpetual easement to construct two concrete retaining walls within areas totaling about 0.015 of an acre;
(2) A full and perpetual easement to slope for the support of the highway within an area of about 0.102 of an acre;
(3) A temporary easement for the construction of the aforesaid two concrete retaining walls, including the right to install all necessary appurtenances thereto, within areas totaling about 0.367 of an acre;
(4) A right to relocate Univac Lane within an area of about 0.203 of an acre on the south side of Bloomfield Avenue; and
(5) A right to construct a type "C-L" catch basin, endwall and 15-inch reinforced concrete pipes within each of two specified areas.
Said premises were taken "to be used for a Limited Access Designated Highway, Interstate Route 91, Designation No. 71, and Bloomfield Avenue in connection with said Interstate Route 91, from which highway access is denied to and from [the remaining land of the plaintiffs] lying westerly and southerly thereof, respectively, as shown on said map. "
Said premises were taken subject to an easement in favor of the Town of Windsor, and a further easement in favor of The Connecticut Light Power Company, both of which appear of record.
The notice of condemnation and assessment of damages specified that "[t]he aforesaid two rights shall terminate automatically upon completion of said work by the State of Connecticut." Notwithstanding this proviso, CT Page 8320 it is manifest that although the "right to relocate Univac Lane" within the plaintiffs' property will terminate upon the completion of the highway by the defendant, the relocated street will constitute an indefinite or permanent appropriation of about 0.203 of an acre of their land for that purpose. The same conclusion is made with the "right to construct" two catch basins, endwalls and 15-inch reinforced concrete pipes on the plaintiffs' property. Their installation will constitute immovable fixtures and an indefinite or permanent appropriation of the unmeasured land supporting them.
It is a basic requirement in eminent domain proceedings that the property to be condemned and all accompanying rights, easements and interests, whether temporary or permanent, be described with reasonable certainty. The condemnation of property affects the title to real estate. The owner is entitled to know with certainty what the condemning authority seeks to appropriate from his ownership of the property. Such descriptive accuracy is essential for the protection of the rights of the parties, as well as of the public for whose use the condemnation has been undertaken.
"The fact that the description is incomplete or unintelligible without consultation with a map or plan is not objectionable if the map is referred to in the description and is filed with it, and, taken together, the map and the description make clear what property is intended to be included in the taking." 6 P. Nichols, Eminent Domain (3d Ed.) Section 26.112, pp. 26-72 — 26-73. The description in the notice of condemnation before us and the map referenced therein taken together establish the permanent nature of the defendant's right to relocate Univac Lane and right to construct the catch basins, endwalls and drain pipes beyond the "completion of said work by the State of Connecticut."
The defendant's taking consisted of the fee to three parcels totaling 0.759 of an acre, and of full and perpetual easements and rights to an additional 0.32 of an acre, for a total of 1.079 acres. This was 9.42% of the total parcel of 11.46 acres. To these computed areas there must be added the unmeasured land supporting the catch basins, endwalls and reinforced concrete pipes constructed under the defendant's acquired right and depicted on the referenced map. Finally, the defendant took a temporary easement over two parcels totaling 0.367 of an acre for construction of the two concrete retaining walls and all necessary appurtenances thereto.
Easements acquired by condemnation are not full fee title interests in the subject premises. They are, however, encumbrances on the condemnees' total usable land area for the duration of their existence, while title to the fee simple interest remains in the plaintiffs. "An instrument conveying an interest in land conveys only that which is specifically expressed in the document. Connecticut Light Power Co. v. Holson Co., 185 Conn. 436,441, 440 A.2d 935 (1981)." Alemany v. Commissioner of Transportation,215 Conn. 437, 442 (1990). The condemnor can exercise no more rights over the property than those consistent with an easement. The plaintiffs can make full use of the easement areas for their own purposes, provided that those CT Page 8321 uses are not inconsistent with the defendant's easements. Id. In highway easement cases, the landowner is entitled to compensation for severance damages that might result from prospective uses of the easement as well as damages immediately flowing from the presently contemplated highway improvement project for which the land was taken. Id., 445.
The record reveals that the plaintiffs maximally developed the subject premises in progressive steps before the defendant's condemnation proceedings. That, however, is inconsequential on the issue of damages now before the court. The defendant took the property by eminent domain on September 23, 1988. The plaintiffs are entitled to full, fair and just damages suffered by them on that taking, and only as of that time.
The subject property is in a Restricted Commercial (RC) zone. The zoning regulations material to the development of the premises before the taking are the following:
Section 3.1.5 — Any parking area designed or intended for use by three or more vehicles which is located adjacent to any street right-of-way shall be separated from such right-of-way line by a curbed, planted area not less than 10 feet in width.
Section 3.4.1G — The Town Planning and Zoning Commission (TPZC) may, depending on the parking needs of a particular use, authorize a phased development of the off-street parking area in compliance with the following criteria: (1) The total number of spaces required to be shown on the Site Plan shall be determined in accordance with the standards for that particular use; (2) The construction of the parking area and installation of the spaces may be phased according to the short and long-term needs of a particular use. Not less than 50 percent of the total required spaces shall be constructed as part of the short term; and (3) The spaces which are not intended for construction as part of the short term shall be labeled "Reserve Parking" on the plan and shall be properly designed and shown as an integral part of the overall parking layout and must be located on land suitable for parking area development. (Emphasis added.)
Section 3.4.2 — In all zones, off-street parking spaces shall be provided and permanently maintained for respective uses as hereunder prescribed. C(3) General office uses: one space for each 250 square feet.
Section 7.1 — Restricted Commercial Zone Area and Height Standards: Minimum yard — 50 feet; Maximum building height — 3 stories.
Section 7.2 — No parking is permitted within any required yard.
Section 16.2.16 — Parking area — In determining the required parking area, that portion of a structure allocated to parking shall not be included as part of the gross floor area with which required parking is calculated as per Section 3.4. CT Page 8322
On December 11, 1979, the TPZC, on application of the plaintiffs as prospective purchasers of the subject property under a bond for deed, approved a zone change to Restricted Commercial zone for the balance of the land not previously so zoned. The property had previously been a gravel pit and contained wetlands. Later at the same meeting, the plaintiffs presented site plans for what are now Nos. 1 and 10 Univac Lane. The development plan was in two parts. The two office buildings and parking for 385 cars were to be constructed in two phases, No. 10 Univac Lane being first. The drainage and detention system were also to be installed as part of Phase I. The commission approved the site plans on December 26, 1979.
On or about December 17, 1979, the plaintiffs applied to the Windsor Inland Wetlands and Watercourses Commission (IWWC) for a permit to regrade the site to eliminate a pond and an intermittent watercourse. At the hearing on this application, the plaintiffs represented that the "man-made pond will be removed and the detention basin will be permanent." (Emphasis added.) The application was granted on January 8, 1980, for the reasons "that the man-made pond seems to be dry a good portion of the year; the detention basin appears to be more than adequate; and that there will not be any significant impact to the Wetlands or to a major Watercourse."
On July 14, 1980, the TPZC approved a revision of the site plan to relocate the detention basin to an area along the eastern boundary, its location at the time of taking. One of the conditions of this approval was that "[t]he twenty-six (26) parking spaces which were proposed at the westerly side of the Phase I building be eliminated." Construction of No. 10 Univac Lane (Phase I) began in 1980.
On September 9, 1980, a hearing took place before the TPZC on a revision of the site plan to allow construction of No. 1 Univac Lane (Phase II). In explaining the proposed plan and rendering, the plaintiffs represented that "[t] he building is 22,000 square feet larger than the Phase I building [46,908 + 22,000 = 68,908 square feet], and there will be parking in the basement." There were three stories, the maximum allowed by the zoning regulations, proposed to be constructed above the basement with a total floor space of 68,908 square feet and requiring 275 parking spaces, including 64 spaces in the basement of the building. The site plan for Phase II (No. 1 Univac Lane) was approved with "47 parking spaces in reserve."
"Basement" is defined in section 16.2.2 of the zoning regulations as that portion of a building which is partly underground and has less than half of its clear floor-to-ceiling height above the grade of the adjoining ground along all walls of the building. For the purpose of the regulations, the words "basement" and "cellar" are synonymous.
"Story" is defined in section 16.2.19 as that portion of a building, other than a half-story or a basement, between any floor and the ceiling or roof next above it. A story shall include that portion of a building which is partly underground and has half or more of its clear floor-to-ceiling CT Page 8323 height above the average finished grade of the adjoining ground along all walls of the building. "Gross floor area" is defined as the area of all floors, measured within the outside perimeter of the exterior walls of a building, including hallways, stairs, closets, the thickness of interior walls, columns and other features.
Simultaneously with this extension of the development, the plaintiffs were negotiating a permanent easement and right of way agreement with the Town of Windsor for Univac Lane. On September 5, 1980, the plaintiffs granted such an easement, but the town did not accept the right of way and execute its agreement to maintain the easement "for all purposes for which a public highway or street may be used," even though the only property accessed and served by this unnamed road was the subject property of the plaintiffs, until October 10, 1980. The permanent easement and right of way agreement was recorded on the Windsor Land Records on the same day.
On August 4, 1981, the plaintiffs advised the TPZC of a proposal to lease the entire building No. 1 Univac Lane with 200 reserved parking spaces. For this purpose they sought approval to remove the 64 spaces underneath the building. In support of this request, they wrote as follows: "The present plans, which have been approved by your Commission, provide that the parking for the entire parcel be for 463 spaces including 64 which were to be located underneath the building to be leased. The first building, which has marked 191 spaces for use, is completely occupied and utilizes less than 100 spaces. The second building, including the underground parking, would, in accordance with the plan, provide for 272 spaces. As presented to you earlier, the plan also shows there is other open space which could be marked for parking." (Emphasis added.)
The complete minutes of the TPZC meeting held on August 17, 1981, to consider this revision record the following: "Daniel Ferraina, 10 Univac Lane, stated that he has been approached by representatives of a major insurance company that wishes to lease the entire Phase II building. The potential tenant has requested that the 64 parking spaces shown on the lowest level of the building (approximately 18,000 square feet) be eliminated so that the floor space may be used for storage. Mr. Ferraina indicated that the 64 spaces could be relocated and shown as `reserve' parking spaces: 59 over the detention pond and 5 at one of the corners of the property. It was pointed out that if the lower level is utilized for other than storage, 72 parking spaces would be required (instead of the 64 previously approved). The applicant indicated that these spaces could be provided on the site. However, the Planner indicated that four-story buildings were not permitted in the RC zone. The applicant agreed that if the paved parking areas are found to be inadequate and it became necessary for vehicles to park on Univac Lane, the required `reserve' parking spaces will be installed." (Emphasis added.)
Without further comment or discussion recorded in the official minutes, the TPZC approved "the revision to the site plan, subject to staff review and approval." It is evident from the minutes and the TPZC action therein CT Page 8324 that No. 1 Univac Lane was to be constructed as a three-story building as restricted by section 7.1 of the zoning regulations with a basement for storage in place of the previously proposed parking for 64 cars. By the plaintiffs' own admission to the TPZC, its gross floor area was to be 68,908 square feet, 22,000 more than the gross floor area of No. 10 Univac Lane. This gross floor area required 275 parking spaces. This number added to the 191 spaces marked for No. 10 Univac Lane, totaled 466 spaces, which accords with the original number of 463 parking spaces sought in the approved development plan. The only difference was that now 64 spaces were to be located outside No. 1 Univac Lane. The construction of No. 1 Univac Lane was thereafter completed without provision for parking within the building.
The completed building does not conform to the plaintiffs' representations to the TPZC for its approval. There is neither authorization nor approval by either the TPZC or any other town agency in evidence relative to the structure as completed after the August 17, 1981, site plan approval. The description of No. 1 Univac Lane given by the plaintiffs' appraiser: "The building known as One Univac, built in 1981, located on Univac Lane in Windsor, Connecticut, is a four-story structural steel office building consisting of approximately 94,680 square feet based upon the architect's calculations. The first level encompasses the main lobby, office space, a cafeteria and a finished basement. There is a small sub-basement consisting of approximately 1,600 square feet below the first level."
The plaintiffs' building description of No. 1 Univac Lane is not supported by the zoning regulations and the records of the TPZC in evidence. These do not confirm or corroborate, but instead reduce, the description given by the plaintiffs' appraiser.
The defendant's eminent domain proceedings are in three parts: (1) Under Section 13a-73(b) he has condemned a portion of the plaintiffs' land for the layout and improvement of state highways, bounded by Bloomfield Avenue to the north, and I-91 to the east; (2) under Section 13a-73(e) he has condemned a portion of the plaintiffs' land for highway drainage; and (3) under Section 13a-73(f) he has condemned all rights of access to and egress from their land abutting Bloomfield Avenue and I-91.
Section 13a-73(b) is the fundamental law providing for the condemnation of land for highway purchases, and needs no further explanation of its application in this case. Section 13a-73(e) is a concomitant law for the necessary drainage of highways. It likewise needs no further explanation. Section 13a-73(f), however, is important in its bearing upon the plaintiffs' land in these proceedings. As relevant here, it provides the following: "The commissioner may take or purchase rights of access to and egress from land abutting any highway or land taken or purchased as right-of-way therefor . . . when in his judgment such limitation of access is necessary to permit the convenient, safe and expeditious flow of traffic. Such taking or purchase shall be in the same manner and with like CT Page 8325 powers as authorized and exercised by said commissioner in taking or purchasing real property for state highway purposes." (Emphasis added.)
The reason for the defendant's taking of the right of access to and egress from the land condemned for highway purposes in this proceeding is evident from the taking map. Access to and from the former I-91 had been previously denied to the plaintiffs' property under its designation as limited access highway in accordance with the provisions of General Statutes section 13b-27. The designation of I-91 as a limited access highway has now been extended to encompass the plaintiffs' remaining property along the new highway created by the condemnation of the plaintiffs' bordering land. As described in the notice of condemnation, the portion of Bloomfield Avenue being reconstructed with the addition of the entire northerly street frontage taken in this condemnation has been designated as a limited or non-access highway. There are no abutter's rights to a limited access highway. Laurel, Inc. v. Commissioner of Transportation, 180 Conn. 11, 28 (1980); South Meadows Realty Corporation v. State, 144 Conn. 289, 291 (1957).
Parcel No. 3 taken by the defendant consists of the entire frontage of the plaintiffs' property along Bloomfield Avenue, being 0.085 of an acre. The taking line is coterminous with the non-access highway line and runs across the northerly portion of Univac Lane, sealing the remaining portion of the right of way from entry and access to Bloomfield Avenue. Even though the permanent easement and right of way agreement for Univac Lane is of record, the notice of condemnation for this taking was not served upon the Town of Windsor as the grantee of the permanent easement. See General Statutes Section 13a-73(b). Instead, the plaintiffs' premises were "taken subject to an easement now or formerly in favor of the Town of Windsor as contained in an Instrument recorded October 10, 1980, in Volume 396 at Page 94 of the Windsor Land Records."
In substitution for this total and direct denial of highway access to this property, the defendant also took from the plaintiffs the right to relocate the northerly portion of Univac Lane to property adjoining on the west as a replacement route for access to Bloomfield Avenue. To exercise this right, the defendant appropriated 0.203 of an acre of the plaintiffs' property. The property onto which the northerly portion of Univac Lane was deflected was formerly owned by Alfred Curtis Willoughby et al., and is now owned by the defendant by virtue of its condemnation. Whether that condemnation preceded this proceeding has not been established.
Since by this relocation the street lines of Univac Lane have been shifted westward from the limits of the recorded permanent easement and right of way agreement both within and beyond the westerly property line of the plaintiffs, unanswered questions arise concerning the rights and obligations of the parties to the right of way agreement. Similar questions arise concerning the rights and obligations of the defendant pertaining to that portion of Univac Lane outside the plaintiffs' property. These questions are not for the court to decide in this proceeding. In any event, CT Page 8326 the availability of the relocated Univac Lane outside the plaintiffs' boundary as a substitute route for access to Bloomfield Avenue may serve to mitigate the plaintiffs' damages under Section 13a-73(f).
"It has been said that an owner of property abutting upon a public street has a property right in the nature of an easement in the street which is appurtenant to his abutting property and which is his private right, as distinguished from his right as a member of the public. The extent of the easement of access may be said to be that which is reasonably required, giving consideration to all the purposes to which the property is adapted." 3 P. Nichols, Eminent Domain (3d Ed. 1985) section 10.221[2], pp. 373-75. The closing of a street on one side of property, however, is not compensable if there is access by a street on the other side. Id., section 10.221[5] p. 385.
The abutting owner's right of access to his property from a street or highway cannot be destroyed or unreasonably affected by the creation of a limited access highway. Id., section 10.2211[1], p. 390. When access to a highway is taken in condemnation together with and for that highway, as in the case before this court, any loss resulting from being placed on an alternate road, such as the relocated Univac Lane on property of the defendant, should be compensated, but the existence of the alternate road should be considered in mitigation. See id., section 10.2211[3], pp. 402.1-402.2.
It is the plaintiffs' claim that, as finally constructed, the floor space of the two buildings totaled 141,588 square feet. At the prescribed ratio of one parking space per 250 square feet, a total of 567 parking spaces were required. Since the zoning regulations allow for the future construction of required parking through the designation of "Reserve Parking," they maintain that the total required parking had been authorized and approved, even though only 525 parking spaces had been constructed prior to the taking, the remaining 42 spaces being "Reserve Parking" over the detention basin.
Neither at the meeting of the TPZC held on August 17, 1981, nor at any other time in the record, did the commission accept and authorize the suggestion of plaintiff Daniel Ferraina that 59 of the 64 parking spaces transferred outdoors be "reserve parking over the detention pond." Not only would such authorization have violated the provisions of zoning regulation section 3.4.1G(3) that "Reserve Parking" "must be located on land suitable for parking area development," but it would also have violated the provisions of the Inland Wetlands and Watercourses Act, General Statutes Sections 22a-28 — 22a-45, and the Inland Wetlands and Watercourses regulations enforced by the IWWC.
There is no credible evidence before the court in the records of the TPZC and the IWWC to support the claim of the plaintiffs that 567 parking spaces, including 42 "Reserve Parking" spaces over the detention pond, were approved and authorized by these required town authorities as a part of the CT Page 8327 subdivision plan at the time of the taking. It is the finding of the court that 525 parking spaces had been constructed at the time of the taking. The plaintiffs' claim that there were 42 additional spaces of "Reserve Parking" authorized and approved over the detention basin at the time of the taking is not sustained. None of these spaces were, or could legally have been, constructed over the required detention pond on the easterly boundary of the subject premises. The plaintiffs have failed in their burden of proof to sustain this claim.
Activities relevant to the subject property subsequent to the taking confirm this conclusion of the court. By application dated January 31, 1990, the plaintiffs sought approval of the IWWC to the filling of the detention basin to make that area available for parking. An underground galley system was proposed in substitution for water detention. The detention basin had been reduced in area by the taking from 0.47 of an acre to 0.39 of an acre. At the hearing on this application, the plaintiffs alleged that they sought thereby to provide space for the construction of 44 additional parking spaces, claiming at that time that there were 102 spaces less than was required by the zoning regulations.
The minutes of this hearing held on April 3, 1990, reflect in substance these opposing concerns of a neighbor: "Sixty-four (64) parking spaces were originally designed under one of the buildings [No. 1 Univac Lane]; the area was first changed to storage, then to office space. She suggested that the lower level be restored to parking area." The application was denied, one of the commissioners suggesting the original approval for parking on the lowest level of the building and an application to the Zoning Board of Appeals as potential sources of relief.
On September 19, 1990, the Zoning Board of Appeals did grant variances to the plaintiffs of the following zoning regulations: (1) Section 3.2.13 — reduction in required width from nine to eight feet for 159 spaces; (2) Section 3.4.2 — reduction of parking standards by 39 spaces to 528; and (3) — parking permitted in required yards. The effective result of this final favorable action by the zoning board of appeals after the taking was an increase of three additional parking spaces from 525 to 528, although 159 spaces were reduced in width from nine to eight feet. This increased number of parking spaces was achieved notwithstanding that No. 1 Univac Lane had been converted by the plaintiffs to a four-story office building by the elimination of the 64 parking spaces originally proposed for the ground level of the building.
The condemnation by the defendant compelled the plaintiffs to seek additional zoning relief. As a result of the taking of Parcel No. 2, the conforming 50-foot required side yard was reduced. Because the northeasterly corner of the building now was about 38 feet from the taking line, the plaintiffs obtained a variance of Section 7.1 of the zoning regulations. Additionally, a zone change was required because of the relocation westerly of Univac Lane over the former Willoughby parcel acquired by the defendant. In order to comply with the zoning requirement CT Page 8328 that access to an RC zone not be over property of a different zone, the plaintiffs at their expense, but on behalf of the defendant, received the necessary zone change for the relocated portion of Univac Lane.
In addition to the foregoing alleged elements of damage, the plaintiffs complain that the "park-like" appearance of the property's easterly boundary has been destroyed. Trees and shrubbery have been replaced by two high concrete retaining walls and a highway on-ramp within 100 feet of the office building. Since the 20-foot wall is on their property, they foresee potential liability and insurance premiums therefor which would have been avoided had the defendant condemned the land on which the retaining wall stands.
Another claim made is that even though Univac Lane has been relocated, at the present time they are without documentation of a legal right of way to their property. Another impact of the taking alleged is that the potential to add parking spaces on the site has been lost. Another element of severance damage to the remaining land alleged is the noise of anticipated increased flow of traffic after the highway improvements are completed.
William F. Schoenhut, Jr., of the firm of Marshall and Stevens Incorporated, of Philadelphia, testified as an expert appraiser for the plaintiffs, beginning on October 30, 1990. His initial appraisal was completed as of September 7, 1989, and supplemented on October 24, 1990. Although licensed in his home state of Pennsylvania at the time of his appraisals of September 7, 1989, and October 24, 1990, and initial testimony of October 30, 1990, Schoenhut was not licensed as a real estate appraiser in Connecticut.
Public Act No. 88-329, effective July 1, 1989, provided for the licensing of real estate appraisers in the state. Section 4, now General Statutes Section 20-312, required that as of October 1, 1989, all such appraisers be licensed by the Real Estate Appraisal Commission of the Department of Consumer Protection. Section 8, now General Statutes Section 20-317, allowed nonresident appraisers licensed in a state having similar requirements to obtain a license by reciprocity.
Schoenhut first testified for the plaintiffs on October 30, 1990. At that time he was not licensed in this state. Over the objection of the defendant, the court admitted his appraisal report of September 7, 1989, and his testimony thereon. In the interval between the commencement of his evidence and its continuation on November 7, 1990, Schoenhut obtained a Connecticut real estate appraiser license by reciprocity "effective 10/01/90." Subsequently the court admitted in evidence his updated appraisal of October 24, 1990, and his report of November 7, 1990, supplementing his appraisal of September 7, 1989.
Using the income approach as the best methodology for valuation of the subject property, on September 7, 1989, he determined the fair market value CT Page 8329 of the property at the time of its condemnation on September 23, 1988, to be $16,500,000, of which $2,000,000 was allocated to land and $14,500,000 to improvements.
Unacquainted with the methodology of appraising damages in this condemnation under our law, the plaintiffs' appraiser in his initial report and testimony found the specific and total damages to be as follows:
 Permanent land loss $ 148,191 Permanent easement 18,500 Temporary loss of usage 12,900 Cost to provide temporary parking 46,800 Improvement loss 110,899 Landscaping loss 47,226 Functional obsolescence 1,670,000 Noise damage 304,000 Professional fees 25,000 Business disruption 25,000 Mortgage prepayment penalty 454,053
Total $2,862,569
Rounded to $2,863,000
Thereafter, in his written appraisal report of September 7, 1989, and in his testimony thereon he calculated the after taking value to be the difference between the before value and his itemized damages, or $13,637,000.
"When only a portion of a party's property is taken, the landowner is entitled not only to compensation for the value of the property taken, but also to severance damages for the diminution in the value of the landowner's remaining property that the severance of a portion of the property causes. D'Addario v. Commissioner of Transportation, 180 Conn. 293,298, 426 A.2d 280 (1979); 7A P. Nichols, Eminent Domain (3d Ed. 1990) Section 12.02 [1], p. 12-2. To ensure that severance damages are included in the trial court's assessment, damages should be calculated by the `before and after rule,' under which `[t]he proper measure of damages is the difference between the market value of `"the whole tract"' as it lay before the taking and the market value of what remained thereafter.' Northeastern Gas Transmission Co. v. Ehrhorn, 145 Conn. 83, 86, 139 A.2d 53 (1958); Laurel. Inc. v. Commissioner of Transportation, 180 Conn. 11, 36,428 A.2d 789 (1980); Meriden v. Ives, 165 Conn. 768, 770,345 A.2d 13 (1974)." Alemany v. Commissioner of Transportation, 215 Conn. 437, 444-45 (1990).
In his updated appraisal report of October 24, 1990, the plaintiffs' appraiser revised the specific and total damages estimated on September 7, 1989, as follows:
Permanent land loss $ 133,267 CT Page 8330 Permanent easement 18,500 Temporary loss of usage 12,900 Cost to provide temporary parking -0- Improvement loss 64,695 Landscaping loss 47,226 Functional obsolescence 608,000 Noise damage 304,000 Professional fees 25,000 Business disruption 25,000 Mortgage prepayment penalty 233,498
Total $1,472,086
Rounded to $1,472,000
The plaintiffs' appraiser recalculated their damages from the taking for the third time in the November 7, 1990, supplement to his appraisal report of September 7, 1989. Using the income approach, he capitalized the combined net income of Nos. 1 and 10 Univac Lane in the amount of $1,275,230 at 8.5% and estimated the combined market value to be $15,002,706. Deducting site reconstruction costs of $300,000, the net market value was reported to be $14,702,706, which he rounded to $14,700,000. Deducting this valuation from the before taking value of $16,500,000, he estimated the damage from the taking to be $1,800,000.
Brian Hanlon, a staff appraiser for the defendant, testified from his valuation report. In this appraisal he considered and compared the cost approach with the income approach in developing the fair market value of the subject property at the time of the taking. He deemed the comparable sales technique inappropriate, except for land valuation as part of the cost approach, since there were no comparative sales of office buildings within the Windsor area. Utilizing the cost approach, he found the value to be $15,720,000, and by the income method $15,335,000. In his opinion, the income approach, as supported by the cost approach, was considered to be the best indication of value here. Consequently, his valuation of the entire property before the taking was $15,335,000.
In determining the valuation after the taking, Hanlon made the same conclusions concerning the three techniques of valuation, comparable sales, cost and income. Using the cost approach, he estimated the post-taking value to be $15,470,000, which he rejected in favor of his valuation under the income method, $15,040,000. His estimate of damages, therefore, was $295,000 plus $5,000 for the temporary easement to construct the concrete walls, for a total estimate of $300,000, the amount of the assessment of damages by the defendant and paid to the plaintiffs.
Richard H. Barry, an independent appraiser, also appraised the subject property and testified on behalf of the defendant. His conclusions relative to the utilization of the cost approach, comparable sales and income approach were similar to those of Hanlon, except for his CT Page 8331 additional comment that "there was (sic) limited good comparable land sales to develop land value for the cost approach." Therefore, his before taking valuation of the subject property by the cost approach in the amount of $16,377,000 was rejected in favor of his fair market valuation by the income approach in the amount of $15,200,000.
Barry's after taking valuation by the cost method was estimated to be $16,251,000. For the same reason as in his determination of the fair market value before the taking by the income method, he adopted the income approach as the best technique for the after taking value. This he estimated to be $14,969,000, resulting in damages to the plaintiffs from the taking to be $231,000. Adding to this his estimate of further damage caused by the temporary easements for construction of the two retaining walls in the amount of $45,000, he calculated the total damages suffered by the plaintiffs to be $276,000.
All three appraisers are in agreement that the highest and best use of the subject property, as improved, is for the continuation of its present use for office facilities. The court so finds, with the qualification that before the taking it was already overdeveloped for office use beyond its maximum capacity as permitted by the zoning regulations even with the concurrence of the zoning authorities, except as limited by the IWWC, its regulations, and the Inland Wetlands and Watercourses Act, General Statutes Sections 22a-28 — 22a-45.
A state referee sitting as a court on appeals in condemnation cases is more than just a trier of fact or an arbitrator of differing opinions of witnesses. He is charged by the General Statutes and the decisions of our courts with the duty of making an independent determination of value and fair compensation in the light of all circumstances, the evidence, his general knowledge and his viewing of the premises. Minicucci v. Commissioner of Transportation. 211 Conn. 383, 388 (1989); Birnbaum v. Ives,163 Conn. 12, 21-22 (1972); Feigenbaum v. Waterbury, 20 Conn. App. 148,153 (1989). It is his task to reach a result that gives the plaintiff, as nearly as possible, a fair equivalent in money as just compensation for the property taken. Mathis v. Redevelopment Agency, 165 Conn. 622, 623
(1973); Feigenbaum v. Waterbury, supra, 153-54.
"When only a part of a tract is taken for the public use, `just compensation' includes recovery for the part taken and recovery for any damages visited upon the remainder which result from the taking. Bowen v. Ives, 171 Conn. 231, 238, 368 A.2d 82; Meriden v. Highway Commissioner,169 Conn. 655, 659, 363 A.2d 1094. `The ordinary rule for measuring damages where a portion of a tract of land is taken is to determine the difference between the market value of the whole tract as it lay before the taking and the market value of what remained of it thereafter, taking into consideration the changes contemplated in the improvement and those which are so possible of occurrence in the future that they may reasonably be held to affect market value.' Lefebvre v. Cox, 129 Conn. 262, 265,28 A.2d 5 [1942]. The court should consider any and all damages which will CT Page 8332 foreseeably follow from the proper construction of the project, including any damage to the remainder which is a necessary, natural and proximate result of the taking. Budney v. Ives, 156 Conn. 83, 88, 239 A.2d 482." D'Addario v. Commissioner of Transportation, 172 Conn. 182, 184-85,374 A.2d 163 (1976); Darling v. Waterford. 7 Conn. App. 485, 486 (1986).
The elements of the plaintiffs' damages due to the defendant's taking on September 23, 1988 are: (1) loss of fee to three small parcels of land totaling about 0.759 of an acre; (2) two full and perpetual easements totaling about 0.117 of an acre; (3) a temporary easement for the construction of two concrete retaining walls of about 0.367 of an acre; (4) the relocation of Univac Lane within an area of about 0.203 of an acre; (5) the right to construct a type "C-L" catch basin, endwall and 15-inch reinforced concrete pipes within each of two specified areas; (6) condemnation under General Statutes section 13a-73(f) of rights of access to and egress from subject property to I-91 on the east and Bloomfield Avenue on the north, designated as limited access highways adjacent thereto; (7) physical loss of improvements and landscaping; and (8) temporary loss and disruption of parking areas.
The plaintiffs' claim for increased traffic noise and mitigation by the replacement of windows, alleged in the amount of $304,000, is grossly exaggerated and lacks credibility for proof of consequential damage. We need not, therefore, consider its appropriateness in this case. The remaining claims for professional fees, business interruption and mortgage prepayment penalty are irrelevant and immaterial in this proceeding.
After viewing the site of the subject property, and after giving due consideration to the opinions of expert witnesses and to our knowledge of the elements that establish value, we find that the before taking value of the subject property was $16,000,000, and that the after taking value is $15,475,000. Damages, therefore, are assessed at $525,000.
Judgment may enter for the plaintiffs in the amount of $525,000, less $300,000, or an excess of $225,000, with interest on such excess from the date of taking to the date of payment, together with costs and a reasonable appraisal fee of $2,500.
WILLIAM C. BIELUCH GEORGE D. STOUGHTON SIMON S. COHEN STATE TRIAL REFEREES