[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
There are three principal parties to this action: the plaintiff Charter Communications Entertainment I, LLC (Charter), the University of Connecticut and its Board of Trustees (State), and Lamont Television Systems, dba Televideo (Lamont). Asserting that there are no genuine issues of material fact, the defendants have moved for summary judgment. As a preliminary matter, the court notes that a moving party is entitled to summary judgment if the court is satisfied from the pleadings and proffered documentation that there is no genuine issue as to any material fact. Additionally, in assessing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party. Home Ins. Co v. Aetna Life Casualty Co., 235 Conn. 185 (1995).
Since the filing of these motions, the court has heard oral argument and reviewed briefs, documents, and affidavits from the parties. The court appreciates the high level of competence and professionalism demonstrated by all counsel in this matter.
By way of factual background, at all times relevant to the court's consideration of these motions, Charter has a franchise from the Department of Public Utilities (DPUC) to provide cable services to the geographic area which includes Mansfield, Connecticut, the location of the University of Connecticut's (UCONN) Storrs campus. On August 18, 1989, UCONN and Tele-Media Company of Northeastern Connecticut Limited Partnership (TMC) entered into a ten year agreement for TMC to provide cable services to the UCONN Storrs campus. During the term of this contract, Charter assumed the rights and obligations of TMC under the contract. Pursuant to the terms of this contract, TMC was granted the exclusive right to build, install, and maintain a subscription service system on the Storrs campus to provide cable services to UCONN students arid allied buildings for a period often years. Once the system was built, TMC, and then Charter, provided cable services to UCONN students residing in campus dormitories on an individual subscription basis, and also to classroom and administrative buildings. With respect to the student subscription portion of the service, TMC, and then Charter, was allowed by contract, to determine the charges for services provided to students, and to bill students directly. TMC, and then Charter, was obligated to provide subscribers the same quality of programming generally made available in the rest of the provider's franchise area. CT Page 13482 Finally, UCONN undertook no responsibility for the payment of subscription fees on behalf of student subscribers.
During the latter months of its contract with Charter, UCONN began negotiations with Lamont for the provision of video services to the Storrs campus, including the building of additional infrastructure to enable programming throughout campus, including its selective distribution. Because the contract with Charter was neither extended nor renewed, it terminated on August 17, 1999. UCONN thereafter entered into an agreement with Lamont for Lamont to provide video services at the Storrs campus through a program generally known as HUSKYvision. This contract is presently in effect. In June of 1999, the UCONN Board of Trustees voted to impose a technology fee of one hundred twenty five ($125) dollars per semester on each residential student, an amount intended to pay for telephone, internet, and video services. of this total amount, forty-five ($45) dollars was identified as the amount attributable to video services. This fee is charged to each resident student regardless of whether the student wishes video programming, and even if the student does not possess a television set.
Once Charter learned from UCONN that UCONN did not intend to extend or renew its contract, and Charter learned of UCONN's plans with Lamont, Charter filed a Petition for a Declaratory ruling with the DPUC seeking a determination from the DPUC that Charter had the right to provide cable services to UCONN at its Storrs campus.[1] While UCONN initially requested and was granted party status, UCONN later withdrew from the DPUC proceedings on the basis of its claim that DPUC lacked jurisdiction. In its decision of August 10, 1999, the DPUC found that Charter had the right and obligation to provide cable services to UCONN students residing on campus. UCONN's appeal from this decision is pending in the Superior Court[2]. Thereafter, the plaintiff commenced this action seeking equitable and legal relief
Charter's original complaint contained five counts alleging that the defendants infringed on Charter's cable franchise rights, engaged in predatory pricing, engaged in an illegal tying arrangement, interfered tortiously with Charter's business expectations, and engaged in unfair competition or unfair trade practices. By order dated March 23, 2000, the court dismissed the counts relating to predatory pricing, illegal tying, and unfair competition or unfair trade practices on the basis of sovereign immunity as to the State only. As a result, Charter's complaint now contains two counts against both Lamont and the UCONN: an allegation that the defendants have infringed on Charter's cable franchise rights, and a claim that the defendants have interfered tortiously with Charter's business expectations. There also remains Charter's claim against Lamont alleging unfair competition and unfair trade practices. These claims are CT Page 13483 the subject of the defendants' present motions. Although each defendant separately seeks summary judgment, the motions are treated together since they raise the same issues.
The defendants make several arguments in support of their motions, claiming that any one of them suffices to terminate the litigation.
The defendants assert that to the extent Connecticut's cable franchise legislative scheme, C.G.S. § 16-331 et. seq., was enacted pursuant to federal legislation, it does not operate as a waiver of the State's sovereign immunity. In brief the defendants make the general statement that the Eleventh Amendment of the United States Constitution prohibits suits against states. The U.S. Supreme Court has not accorded theEleventh Amendment such a broad sweep. True, the Court has broadened the strict language of the Amendment to state that Congress may not abrogate a state's sovereign immunity through the commerce clause of Article One of the Constitution, and, more recently, the Court has held thatEleventh Amendment considerations bar citizen-suits based on federal rights against states even in state courts. cf. Seminole Tribe of Florida v.Florida, 517 U.S. 44 (1996); Alden v. Maine, 527 U.S. 706 (1999). But this jurisprudence has not eroded the Court's earlier view that under certain circumstances the Eleventh Amendment does not prevent suits by citizens based on federal law against states seeking either injunctive or declaratory relief. In its 1908 decision in Ex parte Young, the Supreme Court held that the Eleventh Amendment did not prevent an injunctive action against a state's attorney general where the plaintiffs sought to enjoin the attorney general from enforcing an allegedly unconstitutional law. 209 U.S. 123. The reasoning of Ex parte Young, endures. In 1999, the Court in Alden noted: "In particular the exception to our sovereign immunity doctrine recognized in Ex parte Young, 209 U.S. 123 (1908), is based, in part, on the premise that sovereign immunity bars relief against states and their officers in both state and federal courts, and that certain suits for declaratory or injunctive relief against state officers must therefore be permitted if the Constitution is to remain the supreme law of the land." Alden v. Maine, supra, at 747.
Additionally, the Supreme Court has held that suits against state officers to enjoin them from acting beyond their authority are not barred by the Eleventh Amendment with the reasoning that the sovereign immunity of a state is not implicated where an officer of the state acts in excess of his authority. cf. Idaho v. Couer d'Alene Tribe, 521 U.S. 261 (1997),State v. Treasure Salvors, Inc., 458 U.S. 670. That is the nature of Charter's claim against the defendants in this action.
Thus, even if this suit could be framed as one premised on federal law, since it seeks to enjoin the state and its officers from alleged CT Page 13484 unauthorized behavior, it is not barred by the Eleventh Amendment.[3]
The second ground advanced by the defendants is that C.G.S. §16-333a, as an eminent domain statute, does not bind the State. C.G.S. § 16-333a provides, in part: "(b) An owner of a multiunit residential building shall permit wiring to provide community antenna television service in such building provided that: (1) a tenant of such building requests community antenna television services; (2) the entire cost of such wiring is assumed by the community antenna television company . . ." The court agrees that C.G.S. § 16-333a is an eminent domain statute since it requires an owner of a multiunit dwelling to permit entry and installation of wiring on the owner's premises. cf. Loretto v.Teleprompter Manhattan CATV Corp, 458 U.S. 419 (1982). The defendants further argue that since C.G.S. § 16-333a is an eminent domain statute, the authority to take property by eminent domain must be strictly construed in favor of the property owner against the condemnor, and that since the right to enter upon State property is not made explicit in the statute, it should not be inferred. Finally, the defendants argue, since Charter does not have the right of forced entry upon premises owned by the State in order to install cable, it has no claim against the defendants for lost business opportunity or franchise infringement.
The court agrees with the defendants' premise, but not with their conclusion. From the documents provided in conjunction with the pending motions as well and from oral argument the court is aware that Charter had been given access to the dormitories in conjunction with its now expired contract with UCONN to provide cable services to residence halls, and that, pursuant to this contract, Charter expended funds to wire the dormitories and for other infrastructure. However, this effort was undertaken in conjunction with a limited term contract. Once its term had expired, Charter had no reasonable expectation of access to UCONN facilities based solely on the expired contract.
Charter claims, however, that its right to access to UCONN facilities is statutory. C.G.S. § 16-333a provides, in part: "(b) An owner of a multiunit residential building shall permit wiring to provide community antenna television service in such building . . ." Charter argues that UCONN residence halls are multiunit residential buildings, and, therefore, UCONN, the owner, must permit Charter, the franchised cable operator, access to provide cable services to resident students. In response, UCONN asserts that its dormitories are not multiunit residential buildings as defined by statute, and even if they are, C.G.S. § 16-333a, as a forced access statute, does not apply to the state.[4]
CT Page 13485
The court agrees with the State's characterization of C.G.S. §16-333a as a forced access statute. Consistent with its general purpose to assure access to cable services to those who live in multi-unit residences, it requires owners of such buildings to permit the installation of cable wiring in their buildings, and it includes a provision ". . . to reasonably compensate the owner for any taking of property associated with the installation of wiring and ancillary facilities for the provision of community antenna television service." C.G.S. § 16-333a(e).[5]
The State argues that since C.G.S. § 16-333a was not made specifically applicable to property owned by the State, its provisions cannot be understood to apply to state owned property. The court agrees. As a general overview, C.G.S. § 16-333a was enacted to enable tenants who wished cable programming to receive it, to prevent landlords from surcharging such tenants who receive cable programming, and to provide a mechanism for landlords to be compensated for the "taking" involved when a cable provider installs wiring incidental to the provision of cable services. Included in the statute is a provision that any "person, firm or corporation" which violates its terms shall be subject to a per diem
financial penalty of up to one thousand dollars for each day following a final order issued by the DPUC. cf. C.G.S. § 16-333a (i).
The statute does not expressly authorize the taking of state property. Since the property, in this case, UCONN resident dormitories and institutional buildings, are owned by the State and exist for a public purpose, the general "taking" language of C.G.S. § 16-333a is inadequate for the court to conclude that when enacting the statute, the General Assembly intended to grant the DPUC or a private corporation the authority to condemn state property even to the limited extent set forth, or to subject the state to civil process as indicated. Eminent domain statutes are to be strictly construed against the condenmor.Laurel, Inc. v. Commissioner of Transportation, 180 Conn. 11 (1980);State v. Simmons, 160 Conn. 492 (1971). And such a statute will not be held to apply to the taking of state property unless such taking is expressly authorized or is necessarily implied by the purpose and intent of the legislation. cf. Torrington v. Coles, 155 Conn. 199 (1967); Hilandv. Ives, 154 Conn. 683 (1967). A review of the legislative history of C.G.S. § 16-333a does not reveal such a purpose. If the General Assembly intended to include publically-owned properties under the proscriptive umbrella of C.G.S. § 16-333a, it could have done so expressly, and if it had done so, it would have included public entities in its enumeration of "person, firm, or corporation" expressly made subject to its proscriptive remedies.
A determination that C.G.S. § 16-333a does not give a franchised CT Page 13486 cable service provider the right of forced access to state-owned property is not, however, determinative of the defendants' motions. Assuming,arguendo, that the defendants are unlawfully providing cable services to UCONN's students on state owned property, it remains a question of fact whether such operation unreasonably interferes with Charter's franchise rights. Historically, UCONN had contracted with Charter to provide wiring to dormitories in order to make cable services available to students in their rooms on a subscriber basis. Even though C.G.S. § 16-333a does not grant Charter the right to force UCONN to permit it access to dormitories, if UCONN could not legally provide comparable programming to students through other means, Charter's negotiating position with UCONN would, no doubt, have been strengthened towards the end of its contract term, and the horizon of its business opportunities at UCONN would have been brightened. Thus, the mere fact that C.G.S. § 16-333a is inapplicable to these facts does not, as a matter of law, foreclose Charter's claim that the provision of cable services by the defendants wrongly interferes with its franchise rights and business expectations.
The defendants next claim that the State does not need a franchise to own and operate HUSKY vision because it is not a cable operator providing a cable service as defined by statute. They argue that only cable operators need a franchise to operate a cable system and that since the State is not a cable operator maintaining a cable system it does not need a franchise to maintain and operate HUSKYvision. The defendants further reason that because the plaintiff's claims are premised on allegations that the defendants are interfering with its franchise rights by operating a cable system without a franchise, they are entitled to summary judgment if there is no genuine issue of material fact as to whether HUSKYvision is a cable service. The court agrees.
As previously noted by the court in its Memorandum on the Defendants' Motion to Dismiss, Connecticut's statutory scheme, C.G.S. § 16-331
et. seq. relating to cable operators, was enacted pursuant to provisions of the Cable Communications Policy Act (CCPA), as amended. cf.47 U.S.C. § 521 et. seq. Among the stated purposes of the CCPA was Congress' intent to establish guidelines for the exercise of federal, state, and local authority with respect to the regulation of cable systems. 47 U.S.C. § 521. Elsewhere, the CCPA provides that a cable operator may not provide cable service without a franchise.47 U.S.C. § 541 (b)(1). A "cable system" is defined as, ". . . a facility, consisting of a set of closed transmission paths and associated signal generation, reception and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community, but such term does not include . . . (B) a facility that serves subscribers without using any public right of way." 47 U.S.C. § 522 (7). CT Page 13487
As to whether it is a cable operator, the State claims entitlement to the exception for cable systems which do not use any public right of way. It is the State's claim that while its own transmission conduits and lines cross university institutional roads these are not public highways and, thus, their system does not use any public right of way. Additionally, while the State concedes that transmission lines do cross two public highways, the State does not control or own those lines but rather leases them from SNETCO, an authorized trunk feeder. The argument that, as a matter of law, university roads are institutional roads and not part of the public right of way is unconvincing. These roads are not gated and they are accessible to the general public who are subject to the State's motor vehicle laws while on them. Whether or not these roads fall within the definition of a public right of way is a mixed question of law and fact which is not subject to determination on the basis of the affidavits and documentation provided in conjunction with these motions.
However, whether students residing in UCONN dormitories are "subscribers" as defined in the CCPA, and whether HUSKYvision is a cable service are questions amenable to summary determination. The CCPA further defines cable service as, . . . . . the one-way transmission to subscribers of video programming . . ." 47 U.S.C. § 522 (6). Pursuant to 47 C.F.R. § 76.5, a cable system is defined as a "facility . . . that is designed to provide cable service and which is provided to multiple subscribers within a community." The term "subscriber" is defined by regulation as "a member of the general public who receives broadcast programming distributed by a cable television system and does not further distribute it." 47 C.F.R. § 76.5 (33). Thus, if UCONN students residing in dormitories cannot be said to be members of the general public, or if they cannot be said to be the "subscribers" to UCONN's video programming system, then HUSKYvision cannot be said to be a "cable service
UCONN students who reside in dormitories are not members of the general public. While in one sense, every human being is a member of the general public, when a group of individuals is separated from the general public by a commonality which defines membership in the group and distinguishes the group from the public-at-large, then membership in the group is a characteristic which separates group members from the general public. That is the sense in which the phrase "members of the general public" is used in statutory and decisional law. For example, while it may be said that courts are open to members of the general public, in order to prosecute a civil action, an individual plaintiff must have standing. He must claim specific aggrievement for his claim to be justiciable. cf. Gay and Lesbian Law Students vs. Board of Trustees, 236 Conn. 453 (1996). Similarly, in Levine v. Police Commission, where a group of residents had successfully petitioned a municipal police commission to restrict certain CT Page 13488 in-town parking, the Appellate Court determined that it had been unnecessary to name the successful petitioners as parties on appeal because, as members of the general public, they had no particular standing, and their interests were adequately protected by the commission. 28 Conn. App. 344 (1992). Cf also Connecticut Business 
Industry Association vs. CHHC, 218 Conn. 335 (1991).
In the law of nuisance, a public nuisance has been held to be one which affects the rights of all the public. Thus, for example, an action for public nuisance may not be maintained by certain plaintiffs as members of the general public, "where no injury to them other than that which is common to all the public is shown." Belford v. New Haven, 170 Conn. 46,52 (1975). Similarly, a nuisance has been deemed to be public when it constitutes an obstruction to public rights, "that is, the rights enjoyed by citizens as part of the public." (Internal citations omitted) Higginsv. Connecticut Light Power, 129 Conn. 606, 611 (1943)
When an activity is limited to a specific group, it has been held not to be available for public use. Thus, in State v. Boucher, the court held that a parking lot which was limited to a restricted group, in this case retail store employees, was not a public area. The court opined: "The state does not dispute that the use of the Midas lot was limited to a restricted group. The sole question is whether the use by the restricted group is sufficient to constitute public use. A public use exists where the public has a right to receive and enjoy the benefit of the use. Where the use is for a "limited number of persons, or a restricted group, ' it is not a public use. The court must give each word and phrase in legislative acts meaning. "Open to public use' logically distinguishes malls and other shopping center parking lots from lots that are restricted to use by a discrete class, and where that restricted use is strictly enforced." (internal citations omitted) 11 Conn. App. 644, 647
(1987).
Thus, in the court's view, the phrase "members of the general public" as utilized in 47 U.S.C. § 522 (6) and47 C.F.R. § 76.5 is to be equated with the phrase "public at large".
From the documentation provided to the court, it is apparent that the UCONN residential student body, though drawn from members of the general public, has several characteristics distinguishing it from the general public. Students who matriculate at UCONN must be accepted into the academic community, and they maintain membership in the community only by adherence to University rules of behavior and academic standards. UCONN dormitories are not available to the general public but only to those permitted access to the dormitories by permission of UCONN. Students who live in the dormitories have no leasehold interest in their rooms, but CT Page 13489 are entitled to remain in the dormitories only so long as they remain students in good standing and conform their conduct to rules established and enforced by UCONN.
Additionally, HUSKYvision has no subscribers. While the plaintiff correctly points out that UCONN has used the term "subscribers" in regard to the likely number of outlets or destinations served by HUSKYvision, students do not, in fact, have any option whether or not to subscribe to this programming. Documents and affidavits provided to the court in conjunction with these motions reveal that dormitory rooms and other UCONN facilities are provided HUSKYvision. There are no subscribers to HUSKYvision other than UCONN through its contract with Lamont. While students who live in dormitories served by HUSKYvision are charged an identifiable fee for video programming provided to their rooms, they do not participate in the decision whether their rooms are to be wired for HUSKYvision and they are assessed a student fee whether or not they wish the service or even possess televisions. The fee charged to resident students for video programming, though identified as a distinct room cost, is not optional. Thus, while the number of student rooms wired for HUSKYvision may be a factor in setting Lamont's contractual financial entitlement, students are not "subscribers" as statutorily defined.
In summary, it is the combination of state-ownership and control of the buildings together with the fact that access to these buildings is limited to a segment of the population who have matriculated as students of UCONN, or whose entry into the premises is otherwise authorized by UCONN which leads the court to the conclusion that, as a matter of law, HUSKYvision is not provided to members of the general public. Additionally, students are not "subscribers" as defined in47 C.F.R. § 76.5. Because HUSKYvision is not provided to multiple subscribers who are members of the general public but only to dormitories and campus buildings under the sole control and ownership of the State, it is not a cable service as defined in 47 U.S.C. § 522 (6). Since, as a matter of law, HUSKYvision is not a cable service, this provision of video programming by UCONN at its Storrs campus neither violates the plaintiff's franchise rights nor tortiously interferes with its reasonable business expectations. Accordingly, the defendants' motions for summary judgment as to the plaintiff's claims of infringement of franchise rights and totious interference with business expectations are granted.
Charter further claims that Lamont engaged in unfair competition or unfair trade practices in violation of the Connecticut Unfair Trade Practices Act (CUTPA). Charter's CUTPA claim is premised on the assertion that HUSKYvision is a cable service, and, as such, it unlawfully infringes on Charter's franchise rights and unreasonably interferes with its business expectations. As a consequence, Charter claims Lamont's CT Page 13490 participation constitutes an unfair trade practice and unfair competition.
CUTPA is codified at Connecticut General Statutes §§ 42-110a through42-110q and provides: "that no person shall engage in unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce." "Trade or commerce" is defined as "the advertising, sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value in this state." C.G.S. § 42-110a(4). In order to hold a defendant liable under this statute, there must be a finding that the defendant engaged in unfair competition and unfair or deceptive trade practices." Sportsmen's Boating Corp. v. Hensley, 192 Conn. 747, 755-56,474 A.2d 780 (1984).
While Lamont's participation in creating HUSKYvision may fairly be characterized as "trade or commerce," since, in the court's view, the provision of HUSKYvision is not unlawful, there is no genuine issue of fact as to whether Lamont's activities constitute unfair or deceptive trade practices. As a matter of law, Lamont's participation does not offend any established public policy. Charter has made no factual allegations which could be found to be immoral, unethical, oppressive or unscrupulous when viewed in the light of applicable law, nor has Charter set forth factual allegations from which a factfinder could conclude that HUSKYvision causes substantial injury to customers. Thus, the plaintiffs allegations fail to meet the "cigarette rule" as to whether Lamont's participation is unfair. Conaway v. Prestia, 191 Conn. 484, 492-493,464 A.2d 847 (1983).
In light of the court's view that HUSKYvision does not constitute the provision of cable services and that UCONN is not a cable operator as statutorily defined, Lamont's participation in HUSKYvision violates no known public policy. Nor do the allegations against Lamont, even when viewed in the light most favorable to the plaintiff, constitute unfairness. Accordingly, the motion for summary judgment as to this count is also granted.
Bishop, Judge.